**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| D.C., a minor, by and through his mother,<br>A.T., on her own behalf; his grandfather,<br>F.T., on his own behalf, and all<br>others similarly situated | ) ) ) ) ) | Civil Action |
| **Plaintiffs,** | ) ) | No. 2:19cv12 |
| v. | ) ) | **Jury Trial Demanded** |
| Pittsburgh Public Schools, Officer<br>Marion Parker, Mr. Nicholas Sible, and<br>Mr. Mark McClinchie | ) ) ) ) | |
| **Defendant.** | ) ) ) ) ) | |

## CLASS ACTION COMPLAINT

As set forth below, Plaintiffs, D.C., his mother, A.T., and his grandfather, F.T., individually

and on behalf of all similarly situated persons, by and through their undersigned attorneys,

Jeffrey J. Ruder, Kristen C. Weidus, and Ruder Law, LLC, allege the following upon

information and belief (except for those allegations pertaining to Plaintiffs, which are based on

personal knowledge), after due investigation by undersigned counsel.

### PRELIMINARY STATEMENT

1.      Plaintiffs bring this action on their own behalf and on behalf of their son and

grandson, D.C., and as a Class Action on behalf of a Class consisting of all students with

disabilities, as well as those students who should be identified as described in 20 U.S.C. §

1415(k)(5), who have been or will be unlawfully handcuffed or restrained by school police officers or District personnel in the Pittsburgh Public Schools (the "Class").

2.     Plaintiffs and the Class seek to obtain permanent injunctive relief to prohibit the Pittsburgh Public Schools from authorizing or employing the unnecessary and excessive use of physical restraint and handcuffing of schoolchildren, including those with disabilities, and to compel the Pittsburgh Public Schools to revise their policies, practices, and trainings accordingly.

3.     Plaintiffs and the Class further seek an order declaring Pittsburgh Public School's conduct to be unconstitutional and to be a violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

4.     Plaintiffs A.T. and F.T. also seek equitable, compensatory, and punitive damages to remedy Pittsburgh Public School's violations of Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act.

5.     Plaintiffs also seek equitable, compensatory, and punitive damages to remedy the Defendants' violations of the United States Constitution, 42 U.S.C. Section 1983, the Civil Rights Act of 1964, and Title II of the Americans with Disabilities Act.

6.     Plaintiffs also seek reasonable attorneys' fees and costs.

7.     Plaintiff D.C. is an elementary school child with a disability who was unnecessarily and unlawfully restrained and handcuffed at school with excessive force and without necessity by Defendant Marion Parker, the School Police Officer assigned to Plaintiff's then-current elementary school. D.C. was also unlawfully restrained by long-term substitute teacher Mr. Nicholas Sible, as well as then-Liberty Elementary School Principal, Mr. Mark McClinchie.

8.     Pittsburgh Public Schools violated and continues to violate Section 504 by failing to provide the Class with appropriate behavior supports and special education services to address their educational needs.  Instead, the Pittsburgh Public Schools rely on inappropriate disciplinary procedures and law enforcement in lieu of appropriate supports for these students.

9.     As a result of being subjected to unnecessary and excessive handcuffing and unlawful physical restraints, Plaintiff D.C. and the Class experienced pain, fear, emotional trauma, and an exacerbation of their disabilities.

10.     This is also an original action through which Plaintiffs allege that the Pittsburgh Public Schools discriminated against A.T. and F.T. by association, resulting in an additional violation of Section 504 and the ADA.

11.     The named Plaintiffs individually request declaratory and equitable relief to remedy the Defendants' violations, as well as additional monetary damages due to the Pittsburgh Public Schools' deliberately indifferent discrimination of Plaintiffs A.T. and F.T. under Section 504 and the ADA.

12.     Finally, the named Plaintiffs seek all other appropriate relief available and attorneys' fees pursuant to Section 504, the ADA, the Civil Rights Act of 1964, the United States Constitution, the Pennsylvania Human Relations Act, and Section 1983.

## PARTIES

13.     Minor Plaintiff, D.C., is an elementary school student with disabilities enrolled in the Pittsburgh Public Schools. At the time he was unlawfully restrained and handcuffed in February 2017, D.C. was in first grade and was only seven years old.

14.     Plaintiff A.T. is the mother and natural guardian of D.C., and resides within the Pittsburgh Public School District.

15.     Plaintiff F.T. is the grandfather of Plaintiff D.C. and the biological father of Plaintiff A.T.

16.     Defendant Pittsburgh Public Schools (the "District") is a local School District and a public entity organized under the laws of the Commonwealth of Pennsylvania. The District is a Local Education Agency ("LEA") and a recipient of federal funds, and it is therefore legally bound by the provisions of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act, Section 504, the ADA, and Section 1983.

17.     Defendant Marion Parker ("Parker") is an adult individual residing in Allegheny County, Pennsylvania. At all relevant times, Parker acted under color of state law as a School Police Officer employed by Defendant Pittsburgh Public Schools. Parker, based upon her intentional acts and adherence to the customs, policies, or practices of Defendant District is responsible for the violation of Student Plaintiff's and the Class Members' constitutional rights under the Fourth and Fourteenth Amendments.

18.     Defendant Nicholas Sible ("Sible") is an adult individual residing in Pennsylvania. At all relevant times, Sible acted under color of state law as a Pittsburgh Public School District employee. Sible, based upon his intentional acts and adherence to the customs, policies, or practices of Defendant District is responsible for the violation of D.C.'s constitutional rights under the Fourth and Fourteenth Amendments.

19.     Defendant Mark McClinchie ("McClinchie") is an adult individual residing in Pennsylvania. At all relevant times, McClinchie acted under color of state law as a Pittsburgh Public School District employee. McClinchie, based upon his intentional acts and adherence to the customs, policies, or practices of Defendant District is responsible for the violation of D.C.'s constitutional rights under the Fourth and Fourteenth Amendment.

## JURISDICTION AND VENUE

20.     This Complaint seeks appropriate relief for violations and denial of equal access to education pursuant to Section 504, 29 U.S.C. § 794; the ADA, 42 U.S.C. §§ 12101, *et seq.*; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000c, *et seq.*; the Pennsylvania Human Relations Act, 43 P.S. § 955; and 42 U.S.C. § 1983.

21.     This action arises under the laws of the United States, and therefore this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

22.     Further, this action seeks recovery of attorneys' fees and costs pursuant to Section 504, 29 U.S.C. § 794a; the ADA, 42 U.S.C. §§ 12101, *et seq.*; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000c, *et seq.*; and the Pennsylvania Human Relations Act, 43 P.S. § 955.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because the events and omissions giving rise to the claims in this case arose in this judicial district and all parties reside in this judicial district.

24.     The Court has supplemental jurisdiction over claims brought pursuant to the Pennsylvania Human Relations Act and state law because such claims arise from the same set of operative facts as those claims brought pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000c, *et seq*. The facts underlying all claims herein raised are so related that they create the same case and controversy.

25.     Here, Plaintiffs request relief for the Class, as well as injunctive and declaratory relief, all of which are unavailable remedies at the administrative level. Thus, exhaustion is not in issue in the instant action.

## CLASS ACTION STATEMENT

26.     Plaintiffs bring this action as a Class Action under Rule 23(b)(2) of the Federal

Rules of Civil Procedure on behalf of a Class consisting of Plaintiffs and all other students with

disabilities, as well as those students who should be identified as described in 20 U.S.C. §

1415(k)(5), who have been or will be unlawfully handcuffed or restrained by District personnel

or school police officers in the Pittsburgh Public Schools. All class members are, for all relevant

periods, residents of the District.

27.     The Class is so numerous that joinder of all class members is impracticable. The

number of Class Members is not fully known to Plaintiffs at present, but is known to the District

and can be ascertained through discovery.

28.     Plaintiffs' claims are typical of the claims of the other members of the Class, as

Plaintiffs and all other members were injured in exactly the same way—through unlawful

handcuffing or restraints resulting from the District's failure to provide sufficient special

education services, and through the pervasive reliance on School Police Officers to discipline

students with disabilities.

29.     The named Plaintiffs and their counsel will adequately and fairly represent the

interests of the Class.

30.     Plaintiffs know of no difficulty that will be encountered in the management of this

litigation that would preclude its maintenance as a Class Action.

31.     Plaintiffs have no interests that are contrary to or in conflict with those of the

Class.

32.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions effecting individual class members. Among the questions of law

6

and fact common to the class include whether the District's acts as alleged herein violated the Section 504 of the Rehabilitation Act, as well Section 1983, the Pennsylvania Human Relations Act, the Americans with Disabilities Act, and the United States Constitution.

33.     The District has acted on grounds generally applicable to the Class, thereby making the appropriate final injunctive and declaratory relief with respect to the Class as a whole.

## PROCEDURAL HISTORY

34.     The events that form the basis of the Complaint occurred between February 2017 and May 2018.

35.     On June 30, 2017, A.T. filed an Education Discrimination Complaint with the Pennsylvania Human Rights Commission (PHRC). This Complaint alleged that the District inappropriately disciplined D.C. based on his race and disability status.

36.     On December 11, 2017, the District filed an Answer to the PHRC Complaint.

37.     On August 8, 2018, the PHRC had not yet made a determination. As a result, they sent the required letter to A.T. acknowledging her right to bring an action in the appropriate Pennsylvania Court of Common Pleas based on the alleged violations included in her June 30, 2017 Complaint.

38.     On February 12, 2018, A.T. filed an administrative Due Process Complaint with the Office for Dispute Resolution ("ODR").

39.     A Due Process Hearing was scheduled to begin in April 2018. Prior to the initial hearing session, the Parties were able to reach an amicable resolution of the claims appropriately raised in the Office for Dispute Resolution Due Process Complaint. A Settlement Agreement was executed on October 5, 2018.

## FACTUAL ALLEGATIONS

### 2015-2016 School Year

40.     D.C. enrolled in the District in the 2015-2016 school year as a Kindergarten student and attended Liberty Elementary School.

41.     D.C. has been diagnosed with Attention Deficit Hyperactive Disorder ("ADHD") and Oppositional Defiance Disorder ("ODD"), and thus is a qualified handicapped person as defined by Section 504 and the Americans with Disabilities Act.

42.     In December 2015, D.C.'s behaviors began to escalate in the school setting. He was having difficulty remaining in his seat and struggling with directions.

43.     On February 23, 2016, A.T. met with a school counselor regarding D.C.'s escalating behaviors. A.T. agreed to secure outpatient therapy services for D.C. The District, though, failed to provide any recommendations regarding interventions and supports that could be implemented in the school setting.

44.     On March 15, 2016, D.C. eloped from the classroom, failed to follow directions, screamed and cried in the classroom, and lashed out at school staff. The District again failed to initiate an evaluation to determine D.C.'s eligibility for supports or services despite encouraging A.T. to seek outpatient counseling for D.C.

45.     A.T. again met with the District's guidance counselor and D.C.'s teacher on March 16, 2016. The District agreed to provide D.C. with sensory breaks, an accommodation typically reserved for students with disabilities, but did not begin the evaluation process to determine D.C.'s eligibility for special education services and supports.

46.     Throughout this period, the District also made multiple phone calls to A.T. to discuss D.C.'s behaviors at school, which included failing to follow directions, throwing objects, leaving the classroom, screaming, and kicking.

### 2016-2017 School Year

Pittsburgh Public School's Use of Discipline in Lieu of Appropriate Behavior Support

47.     In August 2016, D.C. began first grade at Liberty Elementary School.

48.     D.C.'s behaviors continued to escalate. On September 16, 2016, he was involved in an altercation with another student. The District suspended D.C. for two days.

49.     On September 21, 2016, the District provided A.T. with information regarding the District's Student Assistance Program. This program is designed to assist school personnel in identifying issues which pose a barrier to a student's success. The District again failed to initiate its own evaluation or to provide A.T. with any information regarding the possibility of D.C. being evaluated for special education supports and services.

50.     D.C. was evaluated by Western Psychiatric Institute and Clinic on October 5, 2016, and was ultimately diagnosed with ADHD and ODD.

51.     D.C.'s behavior continued to deteriorate. On October 6, 2016, the school bus driver reported that D.C. hung out of a window while spitting, failed to follow directions, failed to stay in his seat, and engaged in disrespectful behavior.

52.     On October 13, 2016, D.C. engaged with a teacher during instruction, screamed and yelled during instruction, and threw a chair and desk. During this incident, D.C.'s teacher, Mr. Sible, placed his knee on D.C.'s back while he lay on the floor in an attempt to restrain him. The District again referred D.C. to the counselor because of this incident.

53.     A.T. met with the District on October 14, 2016, regarding Mr. Sible's unlawful physical restraint of D.C.

54.     At this meeting, the District again failed to initiate an evaluation of D.C. Rather, it recommended that A.T. medicate D.C. to assist him in managing his behaviors.

55.     On October 21, 2016, D.C. stole his classmates' pencils, threw shoes, threw a garbage can, and pushed other students.

56.     In response to this incident, the District called School Police Officers. D.C., who was a six-year-old first grader at this time, was transported home by School Police Officers via a police patrol car.

57.     D.C. was extremely fearful during this transport, and suffered trauma as a result.

58.     D.C. began attending a social skills group on October 25, 2016. During the first meeting, D.C. ripped down posters, hid under a table, and ran back to his classroom.

59.     Two days later, on October 27, 2016, D.C. threw objects, shoved other students, and screamed during movie time. The District scheduled a meeting to address this incident, but again failed to initiate the evaluation process to determine his eligibility for special education.

60.     On October 28, 2016, D.C. threw a desk, had a physical altercation with a teacher, pushed a cabinet in a room, used inappropriate language toward other students, and climbed a stone ledge to attempt to walk over a high stairwell. The District again called School Police Officers to respond.

61.     Rather than provide D.C. with the supports he so clearly required, the District instead recommended that he be involuntarily committed to a mental health facility. The District also suspended D.C. for three days.

62.     A.T. again met with District officials on October 31, 2016. At this meeting, she verbally requested a special education evaluation. It was also determined at this time that D.C.'s grandfather, F.T., would observe him in class over two days.

63.     During the first day of observation, F.T. noticed that only D.C. and another student of color were forced to face their desks towards the wall. F.T. was extremely disturbed by this inappropriate treatment of his grandson.

64.     During a behavioral incident involving another student, school staff told F.T. that they were required to call the police when they could not manage a child's behavior.

65.     On November 1, 2016, the District created a crisis intervention plan for D.C. Despite having District staff certified in the appropriate use of physical intervention, the plan specifically relied upon the utilization of school police.

66.     Upon his return to school, D.C. continued to receive disciplinary referrals. On November 4 and November 9, 2016, he received lunch detentions for incidents on the bus and in the music room.

67.     On November 16, 2016, D.C. ran in the hallway, locked students in a classroom, accidentally knocked a staff member's glasses off, and stomped on the glasses.

68.     To ensure D.C. received appropriate supports and services, A.T. was forced to obtain an educational advocate.

69.     Because of the significant behavioral incidents and previous use of inappropriate physical restraints, the advocate contacted the local child welfare agency. Agency staff informed the advocate that another incident, of which A.T. had been unaware, had previously been reported. During that incident, Mr. Sible had reportedly choked D.C.

70.     At a meeting on December 14, 2016, the District admitted that Mr. Sible was not certified to utilize restraints. The principal, Mr. McClinchie, also admitted that he had never completed the required documentation for the incidents involving D.C. and Mr. Sible.

71.     At some point, the District began providing D.C. with a paraprofessional. Despite the addition of the paraprofessional, D.C.'s behaviors continued to escalate. On December 20, 2016, D.C. was physically aggressive with the paraprofessional. In response, the paraprofessional pushed D.C. with a book and placed him in a physical restraint against the lockers. A.T. later learned that the paraprofessional was not properly certified to utilize restraints.

<u>January 5, 2017: Unlawful Handcuffing and Restraint of D.C.</u>

72.     On January 5, 2017, D.C. reportedly destroyed school property in the hallway, threw objects, pushed staff members, and failed to follow directives.

73.     While D.C. was escalated, the school principal, Mr. McClinchie, physically prevented D.C. from leaving a small room, amounting to another unreported and unlawful restraint. D.C. fled the small room, and School Police were called in response.

74.     When the District contacted A.T., school staff informed her that the School Police had been called and they would bring D.C. home if she did not come to get him immediately.

75.      Officer Marion Parker then reported to the school, and proceeded to unlawfully handcuff and restrain D.C.

76.     When A.T. arrived at the school, she was confronted by Officer Parker. Officer Parker threatened to involuntarily commit D.C. if A.T. did not take him from the school. Again, rather than provide D.C. with the supports he obviously required, the District improperly disciplined him and removed him from school.

12

77.     Officer Parker spoke to A.T. in a disrespectful and aggressive tone, and A.T. felt intimidated and fearful.

78.     After she took him home, D.C. informed his mother that he had been handcuffed by Officer Parker during the incident. The District had deliberately omitted this information from discussions with A.T., and D.C. was no longer in handcuffs when she arrived at the school.

79.     Horrified, A.T. and F.T. went to the local police precinct to determine the truth of D.C.'s statements. When they arrived, another officer met them at the station, and informed them in no uncertain terms that D.C. had in fact been handcuffed.

80.     The family was stunned—D.C., a first grade student, had been handcuffed by police in his school building.

81.     Because of her very valid concerns about D.C.'s safety at school and the inappropriate responses to his behaviors, A.T. removed D.C. from school on January 9, 2017. He was unable to return until January 17, 2017.

82.     Following his handcuffing in school, D.C. began to develop additional behaviors. His family noted that he became frustrated more easily at home and was extremely fearful of police when he noticed them in the community. D.C. was also reluctant to spend time with adult men, as he feared he would be physically restrained as he had been by Mr. Sible and Mr. McClinchie.

83.     A.T. was extremely upset, as she felt she had failed to protect D.C. She had trusted that the District would appropriately educate as well as protect her son while he was in the District's custody.

84.     F.T. was also negatively affected. He is very involved in his grandson's life, often travelling from his residence in Washington, D.C. to support his daughter and grandchildren. He

feared that his grandson would continue to be targeted and would suffer additional trauma as a result. He also was concerned for his daughter, A.T., who he watched struggle to come to terms with the abuse her son had suffered.

<u>Evaluation for Special Education Supports and Initial IEP</u>

85.     The District completed an Evaluation Report on January 26, 2017. D.C.'s teachers stated that he refused to remain in the class, ran around the school without permission, threw objects, and hit other students and adults. They recommended a smaller classroom size and additional mental health services.

86.     The Evaluation also included ratings from A.T. and D.C.'s teachers using the Behavioral Assessment Systems for Children—Third Edition (BASC-3). D.C.'s teachers provided scores in the at-risk or clinically significant ranges for almost every scale and composite assessed. In other words, it was clear that D.C.'s teachers were very aware of his emotional, attention-related, and mental health needs. Yet, the District failed to take any steps to provide him with the necessary support.

87.     Ultimately, it was this lack of appropriate behavior support which resulted in D.C.'s discipline problems within the school setting. In short, the District's failures resulted in the handcuffing of a first grade student as well as significant trauma to him and his family.

88.     On February 14, 2017, D.C.'s IEP team met to develop his initial IEP. The team met again on March 15, 2017, and ultimately determined that D.C. required a full-time emotional support setting. As a result, he was placed at the Watson Institute's Friendship Academy, an Approved Private School.

**COUNT I: VIOLATION OF SECTION 504 OF THE REHABILITATION
ACT OF 1973
D.C. AND THE CLASS v.  THE DISTRICT**

**COUNT II: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES
D.C . AND THE CLASS v. THE DISTRICT**

89.     Plaintiffs and the Class hereby incorporate the averments set forth in each of the

preceding paragraphs by reference here as though fully set forth at length.

90.  Section 504 prohibits disability discrimination by recipients of federal funds. The statute

provides that:

> No otherwise qualified individual with a disability in the United States . . . shall,
> solely by reason of her or his disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination under any program or
> activity receiving Federal financial assistance or under any program or activity
> conducted by any Executive agency[.]
>
> 29 U.S.C. § 794(a).

91.     Section 202 of the ADA similarly states: "[N]o qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity." 42 U.S.C. § 12132. This standard applies even to entities that

do not receive federal funds. *Id.*

92.     The same standards govern both the Section 504 and the ADA claims. *S.H. ex rel.

Durrell v. Lower Merion School District*, 729 F.3d 248, 260 (3d Cir. 2013). Thus, Counts I and II

will be considered together here.

93.     Compensatory damages are an available remedy under Section 504 and the ADA

based on a showing of deliberate indifference discrimination. *Id.* at 260-65.

94.     The District receives federal funds and is, therefore, a covered entity within the

meaning of Section 504.

95.     The District is also a "public entity" as defined by the ADA pursuant to 42 U.S.C.

§ 12131.

96.     D.C. has a disability that substantially limits and affects his major life functions

and he is, therefore, a person with a disability within the meaning of both Section 504 and the

ADA.

97.     Courts have generally applied a two-part standard for deliberate indifference,

requiring both (1) "knowledge that a harm to a federally protected right is substantially likely,"

and (2) "a failure to act upon that likelihood." *S.H.*, 729 F.3d at 263.

98.     Deliberate indifference "does not require a showing of personal ill will or

animosity toward the disabled person. . . . However, deliberate indifference must be a deliberate

choice, rather than negligence or bureaucratic inaction." *Id.* (citations omitted) (internal

quotation marks omitted).

99.     D.C. and the Class Members have a federally protected right as children with

disabilities to have access to educational programming in the same way as other children. It is

substantially likely that not having access to an educational program will result in harm.

100.    D.C. and the Class Members were not able to access the educational program due

to their disabilities. They were denied appropriate behavior support services. This lack of

appropriate support ultimately resulted in the District's reliance on school police and

inappropriate discipline in response to behaviors that were a clear manifestation of D.C.'s and

the Class Members' disabilities.

101.    The lack of access to appropriate behavior supports, a necessary element of D.C.'s and the Class Members' educational programs, resulted in harm to D.C. and the Class Members, including cognitive, psychological, and socio-relational damage.

102.    Therefore, the first prong of the deliberate indifference standard is met, as the District had knowledge that D.C. and the Class Members were not receiving appropriate behavior supports, as evidenced by the repeated use of unlawful physical restraints.

103.    Despite this knowledge, the District failed to act to correct this harm. Instead, it relied upon inappropriate discipline and police intervention.

104.    The District knew that its inaction was substantially likely to result in harm to D.C. and the Class Members, students with disabilities intended to be protected by the statutes referenced herein.

105.    Yet, the District failed to act, per the requirements of the second prong of the deliberate indifference standard, despite knowledge that harm to D.C.'s and the Class Members' federally protected rights was substantially likely, resulting in a violation of Section 504 and the ADA.

**COUNT III: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973**
**MS. A.T. and MR. F.T. v. THE DISTRICT**

**COUNT IV: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES**
**MS. A.T. and MR. F.T. v. THE DISTRICT**

106.    The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

107.    The same standards govern both the Section 504 and the ADA claims. *S.H.*, 729 F.3d at 260. Thus, Counts III and IV will be considered together here.

17

108.     A plaintiff asserting an associational discrimination claim under Section 504 and

Title II of the ADA must plausibly allege:

> (1) a logical and significant association with an individual with disabilities; (2)
> that a public entity knew of that association; (3) that the public entity
> discriminated against them because of that association; and (4) they suffered a
> direct injury as a result of the discrimination.

*Schneider v. Cnty. of Will*, 190 F. Supp. 2d 1082, 1091 (N.D. Ill. 2002) (*citing* 28 C.F.R. §

35.130(g)).

109.     The first two elements of an associational discrimination claim are easily met in

the present matter. A.T. is the mother of D.C. F.T. is the grandfather of D.C.  D.C. has a

disability. Furthermore, the District clearly knew of this association.

110.     The District discriminated against F.T. and A.T. because of their association with

D.C. by continuously failing to provide sufficient behavioral support and interventions, despite

A.T. and F.T.'s constant efforts and requests, to allow D.C. to access his education.

111.     The District ignored F.T and A.T.'s concerns, which directly resulted in D.C.

being denied appropriate behavior support, as well as access to a free, appropriate public

education during the 2015-2016 and 2016-2017 school years, prior to D.C.'s initial evaluation.

112.     As a result of the anxiety and stress she experienced because of the incidents

described in this Complaint, A.T.'s mental health has declined. She has been forced to rely on

other family members to assist her in caring for D.C. and his sister, and has suffered extreme

guilt and depression after witnessing the impact the events described herein have had and

continue to have on D.C. Moreover, A.T. was forced to leave her previous job, as she was

constantly being required to come to the school to pick up D.C. as a result of the inappropriate

provision of behavioral supports, or to attend meetings regarding the same. A.T. suffered direct

injury as a result of the discrimination.

113.    F.T. also suffered direct injury as a result of the discrimination. He was forced to witness both his daughter and his grandson suffer because of the District's actions, which significantly impacted his mental and physical health. Moreover, as a hairdresser who resides out of state, F.T. has been forced to turn down clients in order to travel to Pennsylvania to attend meetings and advocate for his family. This has resulted in a reduction of income, as well as significant financial strain on F.T., as travelling to and from Pennsylvania has become extremely expensive.

114.    Moreover, F.T. and A.T.'s father-daughter relationship has also been significantly strained as a result of the situation created by the District's actions.

115.    Therefore, Plaintiffs F.T. and A.T. have suffered discrimination on the basis of their association with D.C., a child with a disability, due to the District's actions.

## COUNT V: UNCONSTITUTIONAL POLICIES AND CUSTOMS PURSUANT TO 42 U.S.C. SECTION 1983 (*MONELL*) D.C. v. DISTRICT

116.    The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

117.    Local government may be sued under Section 1983 "when execution of a government policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978).

118.    D.C.'s rights were violated on school premises.

119.    The District has encouraged, tolerated, ratified and been deliberately indifferent to the following patterns, practices, and customs, and to the need for more or different training,

supervision, investigation, or discipline in the areas of:

 (a) The failure to train teachers and staff on how to identify students in need of special education, specifically positive behavior support;

 (b) Inappropriate reliance on school police officers in situations where students with disabilities display behaviors that are clear manifestations of their disabilities;

 (c) Permit the use of physical restraints, such as handcuffs, by school police when disciplining students with disabilities in the school setting.

120. Even after the District gained actual knowledge of the inappropriate use of physical restraints by school police officers when disciplining students, like D.C., who exhibit behaviors that are a clear manifestation of their disabilities, the District failed to take any action.

121. Rather, the District has continued to implement its policy of employing school police officers and requesting "certain powers be conferred upon such school police by the Court of Common Pleas." *See* Pittsburgh Public School Board Policy #335 (attached hereto as Exhibit A). Therefore, as described herein, the District has violated and continues to violate Section 1983.

### COUNT VI: VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. SECTION 1983 FOR USE OF EXCESSIVE FORCE D.C. v.  ALL DEFENDANTS

122. The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

123. The U.S. Constitution protects citizens against unreasonable seizures and excessive force.

124. "The reasonableness of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out." *Grahan v. Connor,* 490 U.S. 386, 395 (1989).

125.     The seizures of D.C. by the Defendants were unreasonable in light of the totality of the circumstances, including but not limited to:

(a) D.C.'s size, age, and disabilities, including his limited ability to impose physical harms on others and his limited ability to form criminal intent;

(b) That D.C. was experiencing behavior problems associated with his disabilities while at elementary school;

(c) That Officer Parker placed handcuffs designed for adults on D.C.; and

(d) The traumas imposed by the handcuffing.

126.     By engaging in the acts described herein, Defendants Parker, Sible, and McClinchie, acting under color of law and with deliberate indifference, violated D.C.'s rights under the U.S. Constitution to be free from unreasonable seizures and excessive force.

127.     The right of D.C. to be free from unreasonable seizures and excessive force as described herein was clearly established in law at the time of the incidents alleged.

128.     Defendants Parker, Sible, and McClinchie acted maliciously, intentionally, and in reckless disregard to the rights of D.C.

129.     Further, Plaintiffs are informed and believe, and thereupon allege, that Defendant District has failed and continues to fail to train and supervise Defendants Parker, Sible, and McClinchie regarding the restrictions under law on the use of physical restraints, including handcuffs, on students with disabilities.

130.     Moreover, Plaintiffs are informed and believe, and thereupon allege, that Defendant District continues to fail to implement policies, practices, and procedures to prevent such unlawful handcuffing and physical restraints.

131.     As a proximate result of the actions and inactions of Defendants, D.C. suffered and

continues to suffer emotional pain, psychological injury, trauma, and suffering. D.C. also continues to experience fear, distrust, and anxiety regarding law enforcement officers.

### COUNT VII: VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT
### D.C. v. THE DISTRICT

132.    The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

133.    D.C., as an African-American student, is a member of a protected class.

134.    D.C., as a student with a disability, is also a member of another protected class.

135.    The District is a public accommodation as defined by the Pennsylvania Human Relations Act.

136.    D.C. was removed from his classroom and handcuffed by a school police officer on January 5, 2017, and the officer threatened to transport D.C. to Western Psychiatric Hospital.

137.    Upon information and belief, Plaintiffs allege that the District elected to utilize the school police officer to discipline D.C. due to his race and disability status, and Plaintiffs also noted the same type of discipline being used in response to other students of color. Further, Plaintiffs did not observe this type of discipline being used in response to typically developing students.

138.    Moreover, when F.T. observed D.C. in class, he noted that D.C.'s desk was faced toward the wall, away from instruction. One other desk was similarly situated, and that desk belonged to another African American student. No white students were observed to have their desks faced away from classroom instruction.

139.    The District's actions violated Section 5(i)(1) of the Pennsylvania Human Relations Act.

140.     On June 30, 2017, A.T. filed an Education Discrimination Complaint with the

Pennsylvania Human Rights Commission (PHRC). This Complaint alleged that the District

inappropriately disciplined D.C. based on his race and disability status.

141.     On August 8, 2018, the PHRC sent a letter to A.T. acknowledging her right to

bring an action in the appropriate Pennsylvania Court of Common Pleas based on the alleged

violations included in her June 30, 2017 Complaint.

142.     Thus, Plaintiffs have exhausted the required administrative procedures.

**COUNT VIII: VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**
**D.C. v. THE DISTRICT**

143.     The averments set forth in each of the preceding paragraphs are incorporated by

reference here as though fully set forth at length.

144.     Public schools may not discriminate against students on the basis of race, color, or

national origin.

145.     Title VI of the Civil Rights Act of 1964 provides that: "no person shall, on the

ground of race, color, or national origin, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any program or activity receiving federal financial

assistance." 42 U.S.C. § 2000d.

146.     The United States Department of Education has promulgated regulations pursuant

to Title VI that prohibit recipients of its funds from taking certain actions to the extent that those

actions have a disparate impact on groups protected by the statute. 34 C.F.R. §100 *et seq*.

147.     The language of Title VI's implementing regulations provides, in relevant part:

> A recipient, in determining the types of services, financial aid,
> or other benefits, or facilities which will be provided under
> any such program, or the class of individuals to whom, or

the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin. 34 C.F.R. § 100.3.

148.    To establish liability under the Title VI regulations, a Plaintiff must demonstrate that a facially neutral practice has a disproportionate adverse effect on a group protected by Title VI. *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3d Cir. 2002).

149.    If a Plaintiff makes such a prima facie showing, the Defendant then bears the burden of demonstrating the educational necessity of its practices and must show that the challenged course of action is necessary to meet an important educational goal. *Id. See also Shaw v. Reno,* 509 U.S. 630, 634 (1993).

150.    The District's own data demonstrates the disproportionate adverse impact employment of school police officers has on African American students. Source: *Civil Rights Data Collection*.

### COUNT IX: COMMON LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### D.C. v. DEFENDANTS PARKER, SIBLE, AND McCLINCHIE

151.    The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

152.    Officer Parker intentionally and recklessly engaged in conduct that was extreme and outrageous when she elected to handcuff D.C. At the time of the incident, D.C. was an elementary school student.

153.    Defendants Sible and McClinchie intentionally and recklessly engaged in conduct that was extreme and outrageous when they elected to unlawfully physically restrain D.C. At the time of the incidents, D.C. was an elementary school student.

154.    As a direct and proximate cause of Defendants' intentional conduct, D.C. suffered severe emotional distress of a lasting nature. Specifically, D.C. developed Post-Traumatic Stress Disorder as a result of the incidents.

## COUNT X: SUBSTANTIVE DUE PROCESS VIOLATION OF THE FOURTH. AND FOURTEENTH AMENDMENTS PURSUANT TO 42 U.S.C. SECTION 1983 FOR THE USE OF FORCE D.C. v. DEFENDANT PARKER

155.    The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

156.    The force used by Officer Parker against D.C. was objectively unreasonable, excessive, and conscious shocking given D.C.'s age and physical stature, as well as his disability status.

157.    At the time of the complained of events, D.C. had a clearly established Constitutional right under the Fourth Amendment to be secure in his person from excessive force.

158.    D.C. also had a clearly established Constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force.

159.    As a proximate result of Officer Parker's unlawful conduct, D.C. has suffered emotional injuries, and has developed Post Traumatic Stress Disorder.

160.    The actions of Officer Parker described herein resulted in a violation of D.C.'s Fourth and Fourteenth Amendment rights.

**COUNT XI: EQUAL PROTECTION VIOLATION OF THE FOURTEENTH
AMENDMENT PURSUANT TO 42 U.S.C. SECTION 1983
D.C. v. THE DISTRICT**

161.     The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

162.     "The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly." *Curtis v. Kline,* 666 A.2d 265, 267 (Pa. 1995); *citing Laudenberger v. Port Auth. of Allegheny Cnty.*, 436 A.2d 147 (1981).

163.     The "central purpose of the clause is 'to prevent the States from purposely discriminating against individuals on the basis of race.'" *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543 (3d Cir. 2011); *citing Shaw v. Reno*, 509 U.S. 630, 642 (1993).

164.     "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Cty. of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S. 188, 189 (2003).

165.     Intentional discrimination can be shown when…"a facially neutral law or policy is applied differently on the basis of race." *Doe ex rel. Doe v. Lower Merion Sch. Dist.,* 665 F.3d 524, 543 (3d Cir. 2011); *citing Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

166.     In the Pittsburgh Public Schools, students of color, such as D.C., are disproportionately subjected to physical restraint in response to disciplinary incidents. Source: *Civil Rights Data Collection*.

167.     Defendants, together and/or individually, intentionally discriminated against D.C., who was entrusted to their care, because of his race, in violation of the Equal Protection Clause of the United States Constitution.

26

### COUNT XII: VIOLATION OF THE FOURTEENTH AMENDMENT
### STATE CREATED DANGER
### D.C. v. THE DISTRICT

168.     The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

169.     To state a claim under 42 U.S.C. § 1983, "a plaintiff must allege a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States." *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000).

170.     The Due Process Clause of the Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1.

171.     Plaintiffs argue that the District violated D.C.'s Fourteenth Amendment rights, and this violation is actionable pursuant to Section 1983 under the "state-created danger" theory.

172.     To establish a state-created danger claim, plaintiffs must establish four elements:

> (1) The harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff or with a degree of culpability that shocks the conscience; (3) there existed some relationship between the state and the plaintiff such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) that the state actors affirmatively used their authority to create a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all."

*Enright v. Springfield Sch. Dist.,* 2007 WL 4570970, at *8 (E.D. Pa. 2007).

173.     Further, "a constitutional violation may result when 'state authority is affirmatively employed in a manner that injures a citizen or renders him more vulnerable to injury from another source than he or she would have been in the absence of state intervention."

*Id.* (citing *Burella v. City of Phila.*, 501 F.3d 134, 146-47 (3d Cir. 2007)).

174.     The District knew or should have known of D.C.'s vulnerability given his age, and also should have known that D.C. was a student with a disability in need of special education and related supports at the time he was handcuffed in January 2017.

175.     The District, based on this knowledge, should have anticipated that D.C. would have been traumatized when handcuffed and transported by police officers as a result of behaviors that were a clear manifestation of his disability.

176.     The harm ultimately caused to D.C. was foreseeable and fairly direct.

177.     The District acted in willful disregard for D.C.'s safety.

178.     There was a specific relationship between D.C. and the District, in that D.C. was a student with a disability in its care and protection as required by law.

179.     The District used its authority to create the opportunity for harm that otherwise would not have existed by calling school police in response to D.C.'s actions in January 2017, and subsequently failing to instruct school police of D.C.'s unique needs as a student with a disability.

180.     The District's actions were predicated on a failure to act in light of a known risk.

181.     The District's actions manifested a disregard of a high and excessive degree of danger, known to it or apparent to a reasonable person in its position.

182.     The actions of the District were outrageous and willful or undertaken in such a negligent manner as to rise to the level of outrageousness and willfullness.

### COUNT XIII: VIOLATION OF 42 U.S.C. SECTION 1983
### F.T. AND A.T. v. THE  DISTRICT—VIOLATION OF LIBERTY INTEREST

183.     The averments set forth in each of the preceding paragraphs are incorporated by

reference here as though fully set forth at length.

184.     "To state a due process claim under § 1983, a plaintiff 'must identify a

'recognized liberty or property interest within the purview of the Fourteenth Amendment and

show that they were intentionally or recklessly deprived of that interest, even temporarily, under

state law.'" *Anspach ex rel. Anspach v. Cty. of Phila., Dept. of Publ. Health*, 503 F.3d 256, 262

(3d Cir. 2007) (quoting *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990)).

185.     A.T. possessed a liberty interest, guaranteed by the Due Process Clause of the

Fourteenth Amendment to the United States Constitution, in the parenthood and companionship

of her child, D.C., and the maintenance and integrity of their family.

186.     F.T. possessed a liberty interest, guaranteed by the Due Process Clause of the

Fourteenth Amendment to the United States Constitution, in the parenthood and companionship

of his child, A.T., as well as the companionship of his grandson, D.C., and the maintenance and

integrity of their family.

187.     The actions of the District in failing to adequately support D.C., resulting in his

being victimized by school police and Friendship Academy staff, was the proximate cause of

the loss and diminution of these rights.

188.     F.T. and A.T. suffered damage, trauma, and distress, as more specifically

described herein, which were proximately caused by the conduct of the District.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request this Court enter an Order:

1.   Assuming jurisdiction of this case;

2.  Certifying the Class as set forth herein, with D.C., Ms. A.T., and Mr. F.T. as class representatives on their own behalf and on behalf of the class of similarly situated students;

3.  For the Class and Plaintiffs, issue an order enjoining the Defendants from engaging in the unlawful conduct complained of herein and requiring the development of new policies and retraining of all staff on an ongoing basis.

4.  For the Class and Plaintiffs, declaring that the District's actions violated Section 504 of the Rehabilitation Act of 1973;

5.  For the Class and Plaintiffs, declaring that the District's actions violated Title II of the Americans with Disabilities Act;

6.  Declaring that the actions of all Defendants violated the rights of the named Plaintiffs pursuant to the United States Constitution;

7.  Declaring that the actions of Defendants Officer Parker, Christopher Sible, and Mark McClinichie resulted in a violation of state law;

8.  Declaring that the District's actions and omissions constituted discrimination against Plaintiffs A.T. and F.T. based on their association with an individual with a disability under Section 504 and the ADA;

9.  Declaring that the District's actions violated the rights of the named Plaintiffs under Title VI of the Civil Rights Act of 1964, Section 1983, and the Pennsylvania Human Relations Act,

10. Awarding compensatory, monetary, punitive, and exemplary damages to the named Plaintiffs to address the emotional, mental, and physical anguish and distress experienced as a result of the Defendants' actions;

11. Awarding the named Plaintiffs the cost of the lawsuit and reasonable attorneys' fees and costs; and

12. Granting any other appropriate and necessary relief as the Court deems appropriate, including monetary damage, punitive and exemplary damages, and attorneys' fees.

Respectfully Submitted,

/s/ Jeffrey J. Ruder, Esq.
PA Attorney ID 79270
Ruder Law
429 Forbes Avenue, Suite 450
Pittsburgh, PA 15219
Telephone: (412) 281-4959
Email: jeffruder@ruderlaw.com

/s/ Kristen C. Weidus, Esq.
PA Attorney ID 313486
Ruder Law
429 Forbes Avenue, Suite 450
Pittsburgh, PA 15219
Telephone: (412) 281-4959
Email: kristenweidus@ruderlaw.com

Date: January 4, 2019

31