IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

D.C., *a minor, by and through his mother, A.T.,*
*and on behalf of all others similarly situated*;
A.T., *his mother, on her own behalf*; and F.T., *his*
*grandfather, on his own behalf*;

        Plaintiffs,

    vs.

PITTSBURGH PUBLIC SCHOOLS; MARION
PARKER; NICHOLAS SIBLE; and MARK
MCCLINCHIE,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**2:19-cv-00012**

**Judge Marilyn J. Horan**

## OPINION AND ORDER

Plaintiffs, D.C., a minor, by and through his mother, A.T., and on behalf of all others

similarly situated, as well as A.T. and F.T., who is D.C.'s grandfather, on their own behalf, bring

the within action for damages, injunctive relief, and declaratory relief arising from the alleged

unlawful restraint of D.C. while he was a student at Pittsburgh Public Schools. (ECF No. 1).

Plaintiffs bring claims against Defendant Pittsburgh Public Schools (the District), for violations

of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Americans with Disability Act,

42 U.S.C. § 12101 *et seq.*; the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.*; Title VI

of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; and 42 U.S.C. § 1983. Plaintiffs also

bring claims against the individual Defendants, Marion Parker, Nicholas Sible, and Mark

McClinchie, for constitutional violations under 42 U.S.C. § 1983 and for intentional infliction of

emotional distress under Pennsylvania common law.

In response, the District filed Motions to Dismiss under Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6). (ECF Nos. 8, 10). Defendants Parker and McClinchie likewise filed

Motions to Dismiss under Rule 12(b)(6). (ECF Nos. 21, 24). Defendant Sible answered the Complaint. (ECF No. 23). The parties briefed the issues, (ECF Nos. 8, 9, 10, 11, 21, 22, 24–28, and 37), and the Court heard oral argument on the Motions, (ECF No. 41).

For the following reasons, the District's Motion to Dismiss under Rule 12(b)(1) will be granted, and the District's Motion to Dismiss under Rule 12(b)(6) will be granted in part, denied in part, and moot in part. The Motions to Dismiss filed by Defendants Parker and McClinchie also will be granted. Additionally, the Court will dismiss certain claims, sua sponte, for lack of subject matter jurisdiction.

## I. Background

Plaintiff D.C. is an elementary school student enrolled in Pittsburgh Public Schools (the District). (ECF No. 1, at ¶ 13). He resides with his mother, Plaintiff A.T. (Mother). *Id.* at ¶ 14. D.C.'s maternal grandfather, Plaintiff F.T. (Grandfather) travels frequently from his home in Washington, D.C., to participate in D.C.'s care and education. *Id.* at ¶¶ 15, 84. During the 2015–2016 school year, D.C. was enrolled in kindergarten at Liberty Elementary School. *Id.* at ¶ 40. D.C. had difficulty staying seated and following directions, and by December 2015, his behaviors had escalated. *Id.* at ¶ 42. On February 23, 2016, Mother met with a school counselor regarding D.C.'s behavior. *Id.* at ¶ 43. At that time, Mother agreed to secure outpatient therapy services for D.C., but the District did not offer any recommendation regarding interventions and supports that the District could implement. *Id.*

D.C.'s behavior continued, and on March 15, 2016, he "eloped from the classroom, failed to follow directions, screamed and cried in the classroom, and lashed out at school staff." *Id.* at ¶ 44. The following day, on March 16, 2016, Mother met with a guidance counselor and D.C.'s

teacher. *Id.* at ¶ 45. The District agreed to provide D.C. with sensory breaks, but otherwise did not evaluate D.C. to determine his eligibility for special education services. *Id.* at ¶¶ 44–45. Throughout D.C.'s kindergarten year, the District called Mother multiple times to discuss D.C.'s behavior, including "failing to follow directions, throwing objects, leaving the classroom, screaming, and kicking." *Id.* at ¶ 46.

In August 2016, D.C. began first grade, and his behaviors continued to escalate. *Id.* at ¶¶ 47–48. On September 16, 2016, he was suspended for two days following an altercation with another student. *Id.* at ¶ 48. On September 21, 2016, the District gave Mother information about a program "designed to assist school personnel in identifying issues which pose a barrier to a student's success," rather than initiating an evaluation or giving Mother information about having D.C. evaluated for special education services. *Id.* at ¶ 49. On October 5, 2016, Mother had D.C. evaluated by Western Psychiatric Institute and Clinic, where he was diagnosed with attention deficit hyperactive disorder (ADHD) and oppositional defiance disorder (ODD). *Id.* at ¶¶ 41, 50.

D.C.'s concerning behavior continued, and on October 6, 2016, he hung out of a school bus window while spitting, failed to follow the bus driver's directions, refused to stay in his seat, and engaged in disrespectful behavior. *Id.* at ¶ 51. A week later, on October 13, 2016, D.C. disrupted a teacher during instruction, screamed and yelled, and threw a chair and a desk. *Id.* at ¶ 52. During the incident, D.C.'s teacher, Nicholas Sible, attempted to restrain D.C. by placing his knee into D.C.'s back while D.C. laid on the floor. *Id.* Following this incident, the District again did not initiate a special education evaluation for D.C. *Id.* at ¶ 54. Rather, at a meeting with Mother on October 14, 2016, the day after the incident with Mr. Sible, the District recommended that Mother medicate D.C. to assist him in managing his behaviors. *Id.* at ¶¶ 53–

54. The following week, on October 21, 2016, D.C. stole his classmates' pencils, threw shoes, threw a garbage can, and pushed other students. *Id.* at ¶ 55. In response, the District called school police officers, who transported D.C. home in a patrol car. *Id.* at ¶ 56.

On October 25, 2016, D.C. began attending a social skills group at school. *Id.* at ¶ 58. During the group meeting, D.C. ripped down posters, hid under a table, and ran back to his classroom. *Id.* Two days later, on October 27, 2016, D.C. threw objects, shoved other students, and screamed during movie time. *Id.* at ¶ 59. The District scheduled a meeting to address this incident, but did not initiate any process to determine D.C.'s eligibility for special education services. *Id.* On October 28, 2016, D.C. threw a desk, had a physical altercation with a teacher, pushed a cabinet in a room, used inappropriate language toward other students, and climbed onto a stone ledge in an attempt to walk over a high stairwell. *Id.* at ¶ 60. The District again requested school police to respond. *Id.* The District suspended D.C. for three days and recommended that D.C. be involuntarily committed to a mental health facility. *Id.* at ¶¶ 60–61.

On October 31, 2016, Mother again met with District officials and verbally requested a special education evaluation. *Id.* at ¶ 62. Additionally, Mother and the District agreed that Grandfather would observe D.C. during class for two days. *Id.* During Grandfather's observation, he noted that D.C. and another student of color were made to face their desks toward the wall. *Id.* at ¶ 63. A school staff member also told Grandfather that they were required to call the police when they could not manage a child's behavior. *Id.* at ¶ 64.

On November 1, 2016, the District created a crisis intervention plan for D.C. *Id.* at ¶ 65. Rather than use school staff who are certified in the appropriate use of physical intervention, the crisis plan relied upon use of school police officers. *Id.* Unfortunately, D.C.'s behaviors continued. *Id.* at ¶ 66. On November 4 and 6, 2016, D.C. received lunch detentions for incidents

that occurred on the bus and in the music room. *Id.* On November 16, 2016, D.C. ran in the hallway, locked students in a classroom, knocked off and stomped on a staff member's glasses. *Id.* at ¶ 67. Thereafter, Mother obtained an educational advocate. *Id.* at ¶ 68. That advocate contacted the local child welfare agency because of her concerns for the significant behavioral incidents and use of physical restraints at school. *Id.* at ¶ 69. A staff member from the agency informed D.C.'s advocate about another reported incident, unknown to Mother, in which D.C.'s teacher, Mr. Sible, choked D.C. *Id.* In a December 14, 2016 meeting, the District admitted that Mr. Sible was not certified to utilize restraints. *Id.* at ¶ 70. In addition, the school principal, Mark McClinchie, admitted that he never completed the required documentation for the incidents involving D.C. and Mr. Sible. *Id.*

The District began providing D.C. with a paraprofessional, but D.C.'s behaviors continued to escalate. *Id.* at ¶ 71. On December 20, 2016, D.C. was physically aggressive with the paraprofessional. *Id.* In response, the paraprofessional, who was not certified in the use of restraints, "pushed D.C. with a book and placed him in a physical restraint against the lockers." *Id.*

On January 5, 2017, D.C. destroyed school property, threw objects, pushed staff members, and failed to follow directives. *Id.* at ¶ 72. During the incident, Principal McClinchie prevented D.C. from leaving a small room. *Id.* at ¶ 73. D.C. ultimately fled the room, and the school police were called. *Id.* The District contacted Mother and advised her that the school police would take D.C. home if Mother did not pick him up immediately. *Id.* at ¶ 74. Officer Marion Parker reported to the school, and she restrained and handcuffed D.C. *Id.* at ¶ 75. When Mother arrived at the school, Officer Parker threatened to involuntarily commit D.C. if Mother did not take him home. *Id.* at ¶ 76. Based upon the District's responses to D.C.'s behavior,

Mother removed D.C. from school between January 9, 2017 and January 17, 2017. *Id.* at ¶ 81. Additionally, Plaintiffs allege that D.C. developed post-traumatic stress disorder (PTSD) as a result of school officials' treatment of him. *Id.* at ¶¶ 154, 159.

On January 26, 2017, the District completed an evaluation report, wherein D.C.'s teachers described his behavior and recommended smaller classrooms and additional mental health services. *Id.* at ¶ 85. As a part of the evaluation, "D.C.'s teachers provided scores in the at-risk or clinically significant ranges for almost every scale and composite assessed." *Id.* at ¶ 86. On February 14, 2017, a team met to develop D.C.'s initial Individualized Education Program (IEP). *Id.* at ¶ 88. On March 15, 2017, the IEP team met again and determined that D.C. required a full-time emotional support setting. *Id.* Accordingly, he was placed at an approved private school. *Id.*

On June 30, 2017, Mother filed an Education Discrimination Complaint with the Pennsylvania Human Rights Commission (PHRC), alleging the District inappropriately disciplined D.C. based upon his race and disability status. *Id.* at ¶ 35. On August 8, 2018, the PHRC had yet to make a determination and sent a letter to Mother, advising her of her right to bring an action in the appropriate venue. *Id.* at ¶ 37. Additionally, on February 12, 2018, Mother filed an administrative due process complaint with the Office of Dispute Resolution. *Id.* at ¶ 38. A due process hearing was scheduled for April 2018, but prior to the hearing, the parties reached an amicable resolution. *Id.* at ¶ 39. The parties executed a settlement agreement on October 5, 2018. *Id.*

Plaintiffs D.C., Mother, and Grandfather filed the present Complaint on January 4, 2019, against Defendants, the District, Officer Parker, Mr. Sible, and Principal McClinchie. Plaintiffs bring a long list of claims. First, in Count I, D.C., on his own behalf and on behalf of all other

similarly situated, brings a claim under § 504 of the Rehabilitation Act against the District. *Id.* at

¶¶ 89–105.  In Count II, D.C. also brings, on his own behalf and on behalf of all other similarly

situated, a claim under the Americans with Disabilities Act (ADA) against the District. *Id.*

Mother and Grandfather similarly bring a § 504 claim in Count III and an ADA claim in Count

IV against the District for associational discrimination. *Id.* at ¶¶ 106–15.  In Count V, D.C.

brings a *Monell* claim under § 1983 against the District. *Id.* at ¶¶ 116–21.  In Count VI, D.C.

alleges a violation of his Fourth and Fourteenth Amendment rights, pursuant to § 1983, against

the District and the individual Defendants for excessive force. *Id.* at ¶¶ 122–31.  In Count VII,

D.C. brings a claim under the Pennsylvania Human Relations Act (PHRA) against the District

for race and disability discrimination. *Id.* at ¶¶ 132–42.  In Count VIII, D.C. also asserts a race

discrimination claim against the District under Title VI of the Civil Rights Act. *Id.* at ¶¶ 143–50.

Next, in Count IX, D.C. brings a common law intentional infliction of emotional distress claim

against the individual Defendants. *Id.* at ¶¶ 151–54.  In Count X, D.C. alleges a § 1983 claim

against Officer Parker for a "substantive due process violation of the Fourth and Fourteenth

Amendments . . . for use of force." *Id.* at ¶¶ 155–60.  In Counts XI and XII, D.C. also alleges

§ 1983 claims against the District for violating the Equal Protection Clause of the Fourteenth

Amendment and for state-created danger, respectively. *Id.* at ¶¶ 161–82.  Lastly, in Count XIII,

Mother and Grandfather bring a § 1983 claim, alleging a violation of their Fourteenth

Amendment liberty interests. *Id.* at ¶¶ 183–88.

The District moves to dismiss the putative class claims in Counts I and II for lack of

subject matter jurisdiction.  (ECF Nos. 8, 9).  The District also moves to dismiss all remaining

Counts against it for failure to state a claim.  (ECF Nos. 10, 11).  Likewise, Officer Parker and

Principal McClinchie move to dismiss the Counts against them for failure to state a claim. (ECF No. 21, 22, 24, 25).

## II. Subject matter jurisdiction under Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a court may dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Subject matter jurisdiction is the court's "[j]urisdiction over the nature of the case and the type of relief sought; the extent to which a court can rule on the conduct of persons or the status of things." *Subject Matter Jurisdiction*, *Black's Law Dictionary* (10th ed. 2014). In other words, "a court's subject-matter jurisdiction is its power to hear cases." *Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 560 (2017). The plaintiff has the burden of establishing that the court has subject matter jurisdiction, *Reg'l Med. Transp., Inc. v. Highmark, Inc.*, 541 F. Supp. 2d 718, 725 (E.D. Pa. 2008), and the defendant can challenge whether the plaintiff has done so, through either a facial challenge or a factual challenge to the complaint, *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017).

In a facial challenge, the court looks to the face of the complaint and accepts as true the facts alleged by the plaintiff. *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). If the court cannot conclude, based on face of the complaint, that jurisdictional requirements are met, then the court must dismiss the complaint. *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d at 633 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In a factual challenge, however, the plaintiff's factual allegations are not presumed to be true, and the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Hartig Drug Co.*, 836 F.3d at 268.

8

Importantly, even if the defendant does not mount a challenge under Rule 12(b)(1), the court has "an independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). The court cannot exercise jurisdiction where Congress has not given it, even if all parties assume subject matter jurisdiction exists. *Hartig Drug Co.*, 836 F.3d at 267.

In the present matter, the District challenges the Court's subject matter jurisdiction over the putative class action claims in Counts I and II. (ECF Nos. 8, 9). Additionally, for reasons stated below, the Court also considers, sua sponte, the dismissal of other claims for lack of subject matter jurisdiction.

A. Putative class claims

First, in Counts I and II, D.C. alleges that the District violated § 504 and the ADA, respectively. (ECF No. 1, at ¶¶ 89–105). He brings these claims on his own behalf and on behalf of a class of "students with disabilities, as well as those students who should be identified as described in [the IDEA], who have been or will be unlawfully handcuffed or restrained by District personnel or school police officers in the Pittsburgh Public Schools." *Id.* at ¶¶ 1, 26. The District argues that the Court should dismiss the putative class claims because the class members have failed to exhaust their administrative remedies in accordance with the IDEA. (ECF No. 9, at 2–4).

The Individuals with Disabilities Education Act (IDEA) requires participating states, including Pennsylvania, to provide a "free appropriate public education" (FAPE) to children who have special needs. 20 U.S.C. § 1412(a)(1). Participating states "must comply with detailed procedures for identifying, evaluating, and making placements for students with disabilities, as well as procedures for developing [Individualized Education Programs]." *Batchelor v. Rose Tree*

*Media Sch. Dist.*, 759 F.3d 266, 271–72 (3d Cir. 2014). They must also "implement specified procedural safeguards to ensure children with disabilities and their parents[1] are provided with due process." *Id.* at 272. The procedural safeguards, often referred to as the IDEA's administrative process, allow parents or the school to file a due process complaint with Pennsylvania's Office of Dispute Resolution regarding "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* at 272; 20 U.S.C. § 1415(b)(6). Additionally, if a plaintiff wants to pursue claims under the Constitution, the ADA, title V of the Rehabilitation Act, or other federal laws protecting the rights of children with disabilities, and those claims are based on a set of circumstances for which the IDEA provides relief, then those claims must be included in the due process complaint along with the IDEA claim. 20 U.S.C. § 1415(*l*); *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 750 (2017). The IDEA due process complaint affords the parties the right to participate in an impartial due process hearing, conducted before a hearing officer with the Office of Dispute Resolution, to consider all such claims. 20 U.S.C. § 1415(f)(1)(A); 22 Pa. Code § 14.162.

A party who is aggrieved by the hearing officer's findings and decision may appeal to the federal district court. 20 U.S.C. § 1415(i)(1)–(2); 22 Pa. Code § 14.162(o). If neither party appeals, then the hearing officer's decision is final and binding, and a party may later file suit in federal district court to enforce a hearing officer's decision or to seek damages that are not available through the administrative process. 20 U.S.C. § 1415(i)(1)(A); *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 276 (3d Cir. 2014). Alternatively, the parties may reach a settlement

---

[1] Under the IDEA, the definition of "parent" includes natural, adoptive, or foster parents, legal guardians, and "individual[s] acting in the place of a natural or adoptive parent. . . with whom the child lives." 20 U.S.C. § 1401(23).

agreement during the resolution session described in the IDEA. 20 U.S.C. § 1415(f)(1)(B).

Such a settlement resolves the due process complaint and is "enforceable in any State court of

competent jurisdiction or in a district court of the United States." 20 U.S.C.

§ 1415(f)(1)(B)(iii)(II). Once a final decision or settlement is reached, and administrative

remedies are therefore exhausted, the district court has subject matter jurisdiction over plaintiff's

claims. 20 U.S.C. § 1415(i); *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 130 (3d Cir.

2017) (noting that IDEA administrative exhaustion is a jurisdictional requirement).

Despite having deemed administrative exhaustion to be a jurisdictional requirement in the

IDEA context, the Third Circuit has held that plaintiffs need not exhaust the administrative

process when: (1) exhaustion would be futile or inadequate; (2) the issue presented is purely a

legal question; (3) the administrative agency cannot grant relief; or (4) exhaustion would work

severe or irreparable harm upon a litigant.[2] *M.M. v. Paterson Bd. of Educ.*, 736 F. App'x 317,

320 (3d Cir. 2018). Flowing from the futility and no-administrative-relief exceptions, plaintiffs

may be excused from administrative exhaustion in the IDEA context when they "'allege

systemic legal deficiencies and, correspondingly, request system-wide relief that cannot be

provided (or even addressed) through the administrative process.'" *J.T. v. Dumont Pub. Schs.*,

533 Fed. App'x. 44, 54 (3d Cir. 2013) (quoting *Beth V. by Yvonne V. v. Carroll*, 87 F.3d 80, 89

(3d Cir. 1996)). A claim addresses systemic legal deficiencies "'if it implicates the integrity or

reliability of the IDEA dispute resolution procedures themselves, or requires restructuring the

---

[2] In *Wellman v. Butler Area School District*, the Third Circuit recognized a tension in its precedent as to whether IDEA exhaustion can truly be a jurisdictional requirement. *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 130 (3d Cir. 2017). However, the court ultimately concluded that because the parties had not raised the issue, the court would analyze exceptions to exhaustion regardless of whether administrative exhaustion is a prerequisite to subject matter jurisdiction. *Id.*

education system itself in order to comply with the dictates of the [IDEA].'" *J.T. v. Dumont Pub. Schs.*, 533 Fed. App'x. 44, 54 (3d Cir. 2013) (quoting *Doe v. Ariz. Dep't of Educ.*, 111 F.3d 678, 682 (9th Cir.1997)); *see also Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 27 (1st Cir. 2019) (quoting *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1305 (9th Cir. 1992)) (explaining that the "systemic" exception can be met when an alleged violation threatens "'the IDEA's basic goals . . . on a system-wide basis'" or a claim "'challenge[s] policies or practices,' or administrative failures, 'at the highest administrative level'"). However, a claim does not implicate systemic deficiencies "'if it involves only a substantive claim having to do with limited components of a program, and if the administrative process is capable of correcting the problem.'" *J.T.*, 533 Fed. App'x. at 54 (quoting *Doe v. Ariz. Dep't of Educ.*, 111 F.3d at 682). For example, in *P.V. v. School District of Philadelphia*, the plaintiffs, on behalf of a putative class, requested "wholesale changes" to the school district's transfer procedures in which students with autism were transferred "without parental involvement and at a higher rate than the District transfers non-autistic students." *P.V. v. Sch. Dist. of Phila.*, 2011 U.S. Dist. LEXIS 125370, at *22–23 (E.D. Pa. Oct. 31, 2011). The court found that the plaintiffs alleged a systemic deficiency that excused them from the administrative exhaustion requirement. *Id.* at *21–22. The court based its finding in part on the fact that the hearing officer, who presided over two of the plaintiffs' administrative hearings, "admitted that he had no power to grant the kind of system-wide relief requested" by the plaintiffs. *Id.* at *23. The court explained, "If an educational system is broken and requires a system-wide fix that an administrative hearing officer cannot provide, then requiring plaintiff after plaintiff to exhaust his or her administrative remedy before filing suit would undoubtedly be futile." *Id.* at *22.

Here, D.C. argues that the putative class claims should not be dismissed because there is a systemic deficiency like that in *P.V.*, which excuses the putative class from the administrative exhaustion requirement. (ECF No. 27, at 2). Specifically, D.C. alleges that he and class members "were denied appropriate behavioral support services," and that "[t]his lack of appropriate support ultimately resulted in the District's reliance on school police and inappropriate discipline in response to behaviors that were a clear manifestation of D.C.'s and the Class Members' disabilities." (ECF No. 1, at ¶ 100). In other words, D.C. alleges that because he and others like him were not given behavioral support services specific to their needs, they were inappropriately subjected to, rather than excepted from, the school's disciplinary policy. The putative class claims here are thus distinguishable from the class claim in *P.V.* for two reasons. First, the plaintiffs in *P.V.* alleged that it was the school's policy itself that violated the IDEA, whereas here D.C. alleges that a violation of the IDEA (a failure to identify students) triggers the misapplication of the school's policy. Second, the relief sought in *P.V.* was a wholesale change to the policy, whereas what D.C. ultimately seeks here on behalf of the putative class is that the District properly and timely identify students with disabilities so that they can be excepted from the District's general disciplinary policy. And, just as deviations from mainstream education for students with disabilities—for example, the development of IEPs— must be determined on an individualized basis, such exceptions from the disciplinary policy also must be determined on an individualized basis. Because this relief must be sought on a case-by-case basis through the administrative process, and because D.C. does not allege that a systemic deficiency caused the District's alleged failure to properly identify and support D.C. and similarly situated students, D.C. has not adequately pleaded a basis for the putative class to be excused from the IDEA's administrative exhaustion requirement. Consequently, this Court does

not have subject matter jurisdiction over the class claims in Counts I and II, and these claims must be dismissed.

B. Individual Plaintiffs' FAPE-based claims

In the course of analyzing subject matter jurisdiction over the class claims in Counts I and II and reviewing the facts as pleaded in the present Complaint, the issue arose as to whether the Court has subject matter jurisdiction over certain other federal claims in the Complaint. Because the Court has "an independent obligation to determine whether subject-matter jurisdiction exists," *Arbaugh*, 546 U.S. at 514, the Court now considers a sua sponte motion to dismiss claims in Counts I through VI, Count VIII, and Counts XI through XIII, for lack of subject matter jurisdiction.

As noted above, the IDEA's core guarantee is a child's right to a FAPE. 20 U.S.C. § 1412(a)(1). A FAPE includes not only "'instruction' tailored to meet a child's 'unique needs,'" but also "sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry*, 137 S. Ct. at 748–49 (quoting 20 U.S.C. § 1401(26), (29)). The IDEA further obligates schools to identify, locate, and evaluate all children with disabilities, in order to ensure these children receive a FAPE—an obligation known as the "Child Find" obligation. 20 U.S.C. § 1412(a)(3). If a school fails in its obligations, the parent of a child with disabilities can utilize the IDEA's detailed administrative process to seek redress for the school's failures. 20 U.S.C. § 1415. And, as discussed above, the parent must exhaust the administrative process prior to bringing suit in federal court. *Id.*

The IDEA also provides that if a plaintiff wants to pursue any other FAPE-based claims brought under the Constitution, the ADA, title V of the Rehabilitation Act, or other federal laws protecting the rights of children with disabilities, those claims must also be included in, and

exhausted through, the IDEA administrative process. 20 U.S.C. § 1415(*l*); *Fry*, 137 S. Ct. at

750. The Supreme Court has held that a claim is FAPE-based where the gravamen or the crux of

the claim is "the denial of the IDEA's core guarantee," that is, the denial of a FAPE. *Fry*, 137 S.

Ct. at 748. To aid in determining whether the gravamen of a claim is the denial of a FAPE,

rather than garden-variety disability-based discrimination, the Court stated, "One clue . . . can

come from asking a pair of hypothetical questions." *Id.* at 756. The first question is, "could the

plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public

facility that was *not* a school—say, a public theater or library?" *Id.* The second question is,

"could an *adult* at the school—say, an employee or visitor—have pressed essentially the same

grievance?" *Id.* If the answer to both is "yes," it is likely that the gravamen of the complaint is

something other than the denial of a FAPE. *Id.* On the other hand, if the answer to both

questions is "no," then it is likely that the gravamen of the complaint is a denial of a FAPE, and

exhaustion is required. *Id.* The same distinction and similar hypothetical questions apply to

determining whether the gravamen of claims under the Constitution or other federal laws is the

denial of a FAPE. *See Wellman*, 877 F.3d at 134–35.

Lastly, because exhaustion in the IDEA context is a jurisdictional requirement, a plaintiff

must plead facts sufficient to allow the court to conclude that the plaintiff exhausted the

administrative process. *K.S. v. Hackensack Bd. of Educ.*, 2017 U.S. Dist. LEXIS 96365, at *16

(D.N.J. June 21, 2017). Where a plaintiff fails to plead sufficient facts regarding administrative

exhaustion of FAPE-based claims, the court must dismiss those claims for lack of subject matter

jurisdiction.

Here, Plaintiffs' Complaint informs the Court only that an IDEA due process complaint

was filed with the Office of Dispute Resolution, and that the parties subsequently settled. (ECF

No. 1, at ¶¶ 38–39). Plaintiffs do not provide any information regarding the contents of the due process complaint, namely, which claims they brought and later settled through the administrative process. Accordingly, any claim in the present Complaint that falls within the ambit of the IDEA's exhaustion requirement must be dismissed because Plaintiffs have failed to establish this Court's subject matter jurisdiction over such a claim. With that in mind, the Court thus turns to Plaintiffs' claims against the District[3] that are brought under the Constitution, the ADA, title V of the Rehabilitation Act, or other federal laws protecting the rights of children with disabilities,[4] beginning with D.C.'s claims, and then turning to each Mother's and Grandfather's claims.

### i. Counts I and II—D.C.'s § 504 and ADA claims

In Counts I and II, D.C. brings a § 504 claim and an ADA claim, and uses the same paragraphs to allege both. (ECF No. 1, at ¶¶ 89–105). D.C. alleges that as a child with disabilities, he has a right "to have access to educational programming in the same way as other

---

[3] The Court will only analyze Plaintiffs' claims against the District, and not the claims against the individual Defendants. The IDEA's administrative process is for resolving disputes between parents and schools, not between parents and school officials in their individual capacities. *See* 20 U.S.C. § 1415. Consequently, parents are unable to bring, for example, § 1983 actions against individual school personnel like those in Counts VI and X, in an IDEA due process complaint, and the exhaustion requirement therefore does not apply to those claims.

[4] The only federal claim alleged in the Complaint that is not a constitutional, ADA, or Rehabilitation Act claim is D.C.'s Title VI claim. Title VI of the Civil Rights Act of 1964 prohibits only discrimination on the basis of "race, color, or national origin," and does not proscribe disability discrimination. 42 U.S.C. § 2000d. Consequently, Title VI is not a "Federal law protecting the rights of children with disabilities," so a claim brought under Title VI is not subject to the exhaustion requirement of the IDEA. 20 U.S.C. § 1415(*l*). The Court thus does not need to further analyze subject matter jurisdiction regarding D.C.'s Title VI claim in Count VIII.

Similarly, § 1415(*l*)'s list of claims that require exhaustion includes only federal claims, not state law claims. Therefore, D.C.'s state law claims in Counts VII and IX will not be considered here.

children," which is protected by § 504 and the ADA. *Id.* at ¶¶ 99, 105. Additionally, he alleges

that due to the District's actions, he was "not able to access the educational program" and he was

"denied appropriate behavior support services," which are "a necessary element" of his

educational program. *Id.* at ¶¶ 100–01. D.C.'s claims in Counts I and II are thus plainly tied to

the District's alleged denial of a FAPE to D.C. Because Counts I and II are FAPE-based claims,

and because Plaintiffs plead no facts establishing that these claims were administratively

exhausted, they must be dismissed for lack of subject matter jurisdiction.

### ii. Counts V and VI—D.C.'s § 1983 failure to train/failure to supervise claims against the District

In Count V, D.C. asserts a claim under § 1983, alleging that the District violated

unnamed constitutional rights.[5] (ECF No. 1, at ¶¶ 116–21). D.C. bases this claim on the

District's alleged "failure to train teachers and staff on how to identify students in need of special

education, specifically positive behavioral support." *Id.* at ¶ 119. D.C. also points to the

District's alleged "[i]nappropriate reliance on school police officers in situations where students

with disabilities display[ed] behaviors that are clear manifestations of their disabilities," and that

the District "[p]ermit[ted] the use of physical restraints, such as handcuffs, by school police

when disciplining students with disabilities in the school setting." *Id.* In other words, D.C.

alleges that the District violated his rights when it failed to properly identify him as a student

with disabilities in accordance with the IDEA's Child Find provision, which in turn led to D.C.

not receiving proper behavioral supports. Because D.C. alleges that the District failed in its

Child Find duty to him, and because sufficient behavioral supports are a part of FAPE provision,

---

[5] The fact that this Count does not specify which of D.C.'s rights were allegedly violated will be addressed in further detail below in Section III.C.

Count V is a FAPE-based claim. Therefore, Count V must be dismissed for lack of subject matter jurisdiction.

Similarly, Count VI contains allegations against the District like those in Count V. (ECF No. 1, at ¶¶ 122–31). Specifically, D.C. alleges that the District violated his Fourth and Fourteenth Amendment rights when it "failed and continues to fail to train and supervise Defendants Parker, Sible, and McClinchie regarding the restrictions under law on the use of physical restraints, including handcuffs, on students with disabilities." *Id.* at ¶ 129. This claim echoes the allegations in Count V that the District has a duty to train and supervise its employees regarding proper behavioral supports for students with disabilities. Thus, Count VI, as it pertains to the District, is also a FAPE-based claim and must be dismissed for lack of subject matter jurisdiction.

### iii. Count XI—D.C.'s § 1983 equal protection claim

In Count XI, D.C. alleges that the District discriminated against him on the basis of race, in violation of the Fourteenth Amendment's Equal Protection Clause. (ECF No. 1, at ¶¶ 161–67). Although this is a constitutional claim, it is not based on disability or disability discrimination, and so does not fall within the exhaustion requirement of the IDEA. Accordingly, the Court has subject matter jurisdiction over it.

### iv. Count XII—D.C.'s § 1983 state-created danger claim

In Count XII, D.C. brings a state-created danger claim under the Fourteenth Amendment's Due Process Clause. (ECF No. 1, at ¶¶ 168–82). The state-created danger theory of liability is an exception to the rule that the Fourteenth Amendment's Due Process Clause "does not generally impose an affirmative obligation upon states to protect individuals from

private citizens." *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013). A plaintiff proceeding under this theory must prove, in part, that there existed "'a relationship between the state and the plaintiff . . . such that the plaintiff was a foreseeable victim of the defendant's acts,'" as well as that "'a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.'" *Id.* at 177 (quoting *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006)). In the present case, D.C. alleges that his relationship with the District, and thus the District's duty owed to him, arises from the fact that he is "a student with a disability in [the District's] care and protection as required by law." (ECF No. 1, at ¶ 178). D.C. further alleges that the District used its authority, that is, breached its duty, "by calling school police in response to D.C.'s actions" despite the fact that the District "should have known that D.C. was a student with a disability in need of special education and related supports at the time he was handcuffed in January 2017." *Id.* at ¶ 174. By attaching the duty owed and the subsequent breach to D.C.'s rights under the IDEA, Count XII seeks relief for a denial of FAPE. Accordingly, Count XII is a FAPE-based claim that must be dismissed for lack of subject matter jurisdiction.

### v. Counts III and IV—Mother's § 504 and ADA claims

In Counts III and IV, Mother asserts claims for associational discrimination under § 504 and the ADA, respectively. (ECF No. 1, at ¶¶ 106–15). As this Court has previously held in a separate matter, a parent's associational discrimination claim is subject to the exhaustion provision of the IDEA if that claim "relates unmistakably" to the denial of a FAPE. *J.C. v. Greensburg-Salem Sch. Dist.*, 2019 U.S. Dist. LEXIS 138239, at *28–30 (W.D. Pa. Aug. 15, 2019). Here, Mother alleges that the District discriminated against her "by continuously failing to provide sufficient behavioral support and interventions . . . to allow D.C. to access his

education," despite her "constant efforts and requests." (ECF No. 1, at ¶ 110). Mother further alleges that "[t]he District ignored [her] concerns, which directly resulted in D.C. being denied appropriate behavior support, as well as access to a free, appropriate public education." *Id.* at ¶ 111. Mother's associational discrimination claims explicitly state their relation to a denial of FAPE. Therefore, Mother's claims in Counts III and IV are FAPE-based and must be dismissed for lack of subject matter jurisdiction.

### vi. Count XIII—Mother's § 1983 claim

In Count XIII, Mother alleges that the District violated her Fourteenth Amendment right to "the parenthood and companionship of her child" and to "the maintenance and integrity of her family." (ECF No. 1, at ¶ 185). Specifically, Mother alleges that the District's "fail[ure] to adequately support D.C., resulting in his being victimized by school police and [school] staff, was the proximate cause of the loss and diminution of these rights." *Id.* at ¶ 187. Just as in D.C.'s § 1983 claims in Counts V, VI, and XII, Mother's § 1983 claim here is based on an alleged breach of the District's duties under the IDEA—specifically, a duty to provide sufficient supportive services—and thus is a FAPE-based claim. Count XIII, as it pertains to Mother, must therefore be dismissed for lack of subject matter jurisdiction.

### vii. Counts III, VI, and XIII—Grandfather's claims

Lastly, Grandfather joins Mother in Counts III, IV, and XIII, which contain claims under § 504, the ADA, and § 1983, respectively. In contrast to Mother's claims, however, the analysis of Grandfather's claims yields a different result. The IDEA provides relief to children with disabilities and to their parents. 20 U.S.C. § 1412(a)(6); *see also Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 529 (2007) (holding that the "IDEA includes provisions conveying rights to

parents as well as to children"). The IDEA defines "parent" broadly to include "a natural, adoptive, or foster parent"; a guardian; "an individual acting in the place of a natural or adoptive parent (including a grandparent, stepparent, or other relative) with whom the child lives, or an individual who is legally responsible for the child's welfare"; and, in some instances, "an individual assigned . . . to be a surrogate parent." 20 U.S.C. § 1401(23). Based on a plain reading of the statute, no other persons are conferred rights or standing to bring a claim on behalf of the child under the IDEA. The IDEA thus does not provide an administrative process by which a non-parent can seek relief for associational discrimination. Therefore, a non-parent's claims, even if they are FAPE-based, are not subject to the exhaustion provision of the IDEA.

Here, the facts alleged in the Complaint show that although Grandfather is very involved in D.C.'s care and education, Grandfather does not fall within any of the categories of "parent." Grandfather does not live with D.C., nor do the facts indicate that he is a guardian or otherwise legally responsible for D.C. Additionally, neither instance that calls for the assignment of a surrogate parent applies here. As a non-parent, then, Grandfather was not required to exhaust administrative remedies as to his claims in Counts III, IV, and XIII, and the Court thus has subject matter jurisdiction over these claims.

In summary, Plaintiffs do not plead sufficient facts to excuse the putative class from the IDEA's administrative exhaustion requirement. Plaintiffs also do not plead sufficient facts to establish subject matter jurisdiction over D.C.'s and Mother's FAPE-based claims. Accordingly, the class claims in Counts I and II, D.C.'s claims in Counts I, II, V, VI (as it pertains to the District), and XII, and Mother's claims in Counts III, IV, and XIII must be dismissed. Plaintiffs will be given leave to amend the Complaint regarding subject matter jurisdiction.

### III. Failure to state a claim under Rule 12(b)(6)

In the event Plaintiffs can amend their Complaint to overcome the jurisdictional defects, the Court will, in the interest of efficiency, consider now the merits of Defendants' 12(b)(6) Motions as to all claims, including those dismissed for lack of subject matter jurisdiction. In deciding a motion to dismiss a complaint under Rule 12(b)(6), a court must first "accept all factual allegations as true" and "construe the complaint in the light most favorable to the plaintiff." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (internal quotations omitted). The court then must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* A complaint is sufficient only when it is facially plausible, meaning that the court is able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). To be plausible on its face, the complaint must contain more than "[t]hreadbare recitals of the elements of a cause of action" and "mere conclusory statements." *Id.* The court need not "accept unsupported conclusions and unwarranted inferences." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013).

When a court grants a motion to dismiss, the court "must permit a curative amendment unless such an amendment would be inequitable or futile." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (internal quotations omitted). Further amendment is inequitable where there is "undue delay, bad faith, dilatory motive, [or] unfair prejudice." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Amendment is futile "where an amended complaint 'would fail to state a claim upon which relief could be granted.'" *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 631 (E.D. Pa. 2015) (quoting *Great Western Mining & Mineral Co.*, 615 F.3d at 175).

Defendants raise various arguments as to why each of the claims in the Complaint must be dismissed for failure to state a claim. Accordingly, each claim will be addressed below, beginning with D.C.'s claims and then turning to Mother's and Grandfather's claims.

A. D.C.'s (and the putative class's) federal statutory claims against the District

D.C. brings claims against the District under three federal statutes, § 504 of the Rehabilitation Act, the ADA, and Title VI of the Civil Rights Act, in Counts I, II, and VIII, respectively. Counts I and II also contain claims on behalf of a class of similarly situated students. The District challenges the legal sufficiency of each of these claims.

### i. Counts I and II—§ 504 & ADA claims

Both § 504 and the ADA prohibit discrimination against individuals with disabilities, and the same standards generally govern claims under both. 29 U.S.C. § 794; 42 U.S.C. § 12132; *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). In the school context, a plaintiff alleging violations of § 504 and the ADA must show that he "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his] disability." *Chambers*, 587 F.3d at 189. Additionally, if a plaintiff seeks compensatory damages for a § 504 or ADA violation, the plaintiff must also show that the discriminatory conduct was intentional. *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262 (3d Cir. 2013). In order to establish intentional discrimination, the plaintiff must plead facts showing "at least deliberate indifference." *Haberle v. Troxell*, 885 F.3d 171, 181 (3d Cir. 2018). To plead deliberate indifference, the plaintiff must allege, first, that the defendant school district had "knowledge that a federally protected right is substantially likely to be violated." *S.H.*, 729 F.3d at 265;

*Haberle*, 885 F.3rd at 181. Such knowledge must be actual, as "allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference." *S.H.*, 729 F.3d at 266 n.26. Second, the plaintiff must allege that the defendant "fail[ed] to act despite that knowledge." *Id.* at 265; *Haberle*, 885 F.3rd at 181. The failure to act in the face of the requisite knowledge must be "a deliberate choice, rather than negligence or bureaucratic inaction," but it "does not require a showing of personal ill will or animosity toward the disabled person." *S.H.*, 729 F.3d at 263 (internal quotations omitted).

The District argues that Counts I and II should be dismissed because D.C. and the putative class failed to allege sufficient facts to show deliberate indifference. D.C. counters with two arguments: one, that because the putative class is seeking only injunctive and declaratory relief, deliberate indifference is not required for the class claims; and two, that he adequately pleaded deliberate indifference to support his individual claims. As to D.C.'s first argument, the Court agrees. The case law cited above plainly requires a showing of deliberate indifference when the plaintiff seeks compensatory damages, but not when the plaintiff seeks injunctive or declaratory relief. Accordingly, the issue of whether D.C. adequately pleaded deliberate indifference is irrelevant to the putative class claims, which do not seek compensatory damages.

Deliberate indifference is, however, necessary to D.C.'s individual claims for compensatory damages under § 504 and the ADA. D.C. alleges that the District acted with deliberate indifference when it knew that D.C. was "not receiving appropriate behavior supports" but nonetheless "failed to act to correct this harm," and instead relied on police intervention and "inappropriate discipline." (ECF No. 1, at ¶¶ 102–03). More specifically, D.C. alleges throughout the Complaint that the District knew D.C. was diagnosed with ADHD and ODD; that D.C. had frequent and escalating outbursts throughout his kindergarten and first grade years that

required significant disciplinary action and multiple meetings with Mother; that the District recommended or threatened involuntary mental health commitment on at least two occasions; and that the District created a crisis intervention plan for D.C. In other words, D.C. alleges that the District had actual knowledge of D.C.'s disabilities and had ample evidence showing how his disabilities were affecting his access to education. Thus, D.C. pleads sufficient facts to show that the District had actual knowledge that a federally protected right, that is, D.C.'s right to a FAPE, was substantially likely to be violated.

This leaves, then, whether the District made a deliberate choice to not act despite its knowledge. D.C. alleges throughout the Complaint that, when faced with D.C.'s frequent outbursts over nearly two full school years, the District continually chose not to evaluate D.C. for special education services, and instead reacted by implementing other disciplinary measures. Though a closer call than whether the District had the requisite knowledge, it appears that D.C. has pleaded enough facts to show that the District made a deliberate choice not to act. Accordingly, D.C. has adequately pleaded deliberate indifference, as required for claims for compensatory damages under § 504 and the ADA.

In summary, if Plaintiffs can overcome the jurisdictional defects of the Complaint, as discussed above in Section II, both the individual and the putative class claims in Counts I and II will survive a Rule 12(b)(6) motion to dismiss.

### ii. Count VIII—Title VI claim

Next, the District moves to dismiss Count VIII, in which D.C. alleges that the District violated Title VI of the Civil Rights Act, on the ground that the relevant allegations do not rise "above the speculative level." (ECF No. 11, at 14).

Title VI of the Civil Rights Act prohibits discrimination on the basis of race, color, and national origin. 42 U.S.C. § 2000d. To challenge a facially neutral policy under Title VI, a plaintiff must show intentional discrimination, meaning that "the relevant decisionmaker (e.g., a state legislature) adopted the policy at issue 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pryor v. NCAA*, 288 F.3d 548, 562 (3d Cir. 2002). A plaintiff thus "cannot simply assert that [a law or policy] has a disproportionate effect on certain minorities." *Id.* Nor does a decisionmaker's "mere awareness of the consequences of an otherwise neutral policy" suffice to show intentional discrimination. *Id.*

Under Count VIII, D.C. alleges only statements of law and legal conclusions about the standards applicable to his Title VI disparate impact claim, with the exception of one paragraph. That paragraph states, "The District's own data demonstrates the disproportionate adverse impact employment of school police officers has on African American students." (ECF No. 1, at ¶ 150). Based on these scant pleadings, it appears that D.C. is challenging the District's facially neutral decision to employ police officers. D.C. is thus required to allege facts showing that the District decided to employ police officers *because of* their adverse impact on African American students. Unfortunately, the Complaint contains no such allegation, and Count VIII must be dismissed for failure to state a claim.

## B. D.C.'s constitutional claims against individual Defendants

D.C. brings three claims against the individual Defendants in this matter. One of the claims is a state law tort claim, addressed below in Section III.D. The other two claims are, in Count VI, a § 1983 action against all three individual Defendants, and, in Count X, a § 1983 action against Officer Parker only. As to the § 1983 claims against her, Officer Parker first asserts that Counts VI and X are impermissibly duplicative of one another. (ECF No. 22, at 2).

Second, Officer Parker and Principal McClinchie both argue that they are entitled to qualified immunity, (ECF No. 22, at 6; ECF No. 25, at 6), and they make various other arguments related to the merits of the claims.[6]

### i. Whether Counts VI and X are duplicative

As an initial matter, Officer Parker argues that Counts VI and X are duplicative of one another, and as such, they cannot both survive the Motion to Dismiss. (ECF No. 22, at 2). Count VI, captioned as "Violation of the Fourth and Fourteenth Amendment[s] pursuant to 42 U.S.C. § 1983 for use of excessive force," alleges that the three individual Defendants "violated D.C.'s rights under the U.S. Constitution to be free from unreasonable seizures and excessive force" by engaging in the acts described in the Complaint. (ECF No. 1, at ¶ 126). Count VI also alleges that the appropriate standard for this type of claim is the Fourth Amendment "reasonableness" standard. *Id.* at ¶¶ 124–25. Count X, captioned as "Substantive due process violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 for the use of force," alleges that Officer Parker violated D.C.'s "right under the Fourth Amendment to be secure in his person from excessive force" and his "right under the Fourteenth Amendment to bodily integrity and to be free from excessive force." *Id.* at ¶¶ 157–58, 160. Count X advocates the Fourteenth Amendment "shocks the conscience" standard. *Id.* at ¶ 156.

---

[6] Among these arguments, Officer Parker and Principal McClinchie contend, in a somewhat cursory fashion, that D.C. sued them in their official capacities, causing the claims against them to be duplicative of other claims brought against the District. (ECF No. 22, at 3; ECF No. 25, at 4). D.C. agrees that official-capacity suits would be duplicative and argues instead that he has sued the individual Defendants in their individual capacities. Because the Court does not see in the Complaint any language indicating one way or the other, the Court will treat these claims as against the individual Defendants in their individual capacities.

Notably, in D.C.'s response to Officer Parker's Motion to Dismiss, D.C. does not address the issue of whether Counts VI and X are duplicative of one another as to Officer Parker. Rather, D.C. focuses his attention on the excessive force component of Count X and the application of "shocks the conscience" standard. (ECF No. 28, at 2). D.C. does not address Count VI, as it pertains to Officer Parker, at all. And, in response to Principal McClinchie's Motion to Dismiss regarding Count VI, D.C. argues that that claim is about "excessive force in violation of D.C.'s due process rights guaranteed by the Fourth and Fourteenth Amendments," and he now contends that the "shocks the conscience" standard, and not the "reasonableness" standard, applies to Count VI. (ECF No. 37, at 2) (emphasis added). Wading through the confusion, it seems, then, that D.C. would have Counts VI and X both allege the same theory of liability: excessive force by school officials, subject to a "shocks the conscience" analysis. Because duplicative claims cannot all stand, the Court will dismiss Count X as duplicative of the claim against Officer Parker in Count VI.

### ii. Qualified immunity

Next, Officer Parker and Principal McClinchie argue that they are entitled to qualified immunity, which bars D.C.'s constitutional claims against them. And, although Mr. Sible did not move for dismissal, the District raises an argument in relation to the claims against it, regarding the constitutionality of Mr. Sible's conduct, which is relevant here. (ECF No. 11, at 11–12). Accordingly, the Court will address qualified immunity as to all three individual Defendants.

Qualified immunity is generally afforded to government officials who perform discretionary functions. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). It shields these government officials "from civil damages liability as long as their actions could reasonably have

been thought consistent with the rights they are alleged to have violated." *Id.* Whether such a government official "may be held personally liable for allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id.* at 639 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982)). Courts thus generally use a three-part inquiry to decide whether an official is entitled to qualified immunity: "(1) whether plaintiffs allege a violation of their statutory or constitutional rights; (2) whether the right was clearly established at the time of the violation; and (3) whether a reasonable official should have known that the action violated the plaintiff's rights." *Rouse v. Plantier*, 182 F.3d 192, 196–97 (3d Cir. 1999).

As to the first prong of the inquiry, D.C. alleges that Principal McClinchie, Officer Parker, and Mr. Sible violated D.C.'s right to be free from excessive force. The Third Circuit has held that for federal claims alleging the use of excessive force by public school officials, the Fourteenth Amendment's "shocks the conscience" standard applies. *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 172 (3d Cir. 2001). Under this standard, "whether the constitutional line has been crossed" is determined by analyzing four elements. *Id.* at 172–73. First, a court must consider the need for the application of force, that is, whether there was "a pedagogical justification for the use of force." *Id.* Of note, "utilizing force in reaction to a disruptive student serves a pedagogical objective." *JGS v. Titusville Area Sch. Dist.*, 737 F. Supp. 2d 449, 457 (W.D. Pa. 2010). Second, a court looks to the relationship between the need and the amount of force that was used, and asks whether the force used was "excessive to meet the legitimate objective in this situation." *Gottleib*, 272 F.3d at 172–73. Third, the force must have been "applied in a good faith effort to maintain or restore discipline," and not "maliciously and sadistically for the very purpose of causing harm." *Id.* Lastly, the force must have resulted

in serious injury. *Id.* That injury must have been a physical injury, not psychological, mental, or emotional. *See, e.g.*, *JGS*, 737 F. Supp. 2d at 456 (reviewing cases and holding that the excessive force claim failed "on the basis of the undisputed lack of any physical injury").

Here, Principal McClinchie is not alleged to have applied any force at all to D.C. D.C. only alleges that Principal McClinchie restrained him to a small room. Even if that act counted as force, there was a pedagogical reason for corralling D.C. to a confined space. D.C. was in an escalated state, and he had a history of eloping when in such a state. One of the responsibilities of school officials, particularly at the elementary school level, is to supervise students and keep them safe. That responsibility cannot be met if school officials do not take steps to prevent a student, who is a known flight risk, from eloping. Second, attempting to keep D.C. confined, in light of the known risk that D.C. frequently ran, is not "excessive to meet the legitimate objective" of keeping D.C. safe. Third, D.C. does not plead facts showing that Principal McClinchie attempted to confine him to a small room for malicious purposes. D.C. instead argues only that Principal McClinchie's conduct was malicious because D.C.'s age, disability status, and severity of his own conduct made interfering with his freedom of movement inappropriate. Lastly, and perhaps obviously, since Principal McClinchie did not use force on D.C., D.C. did not suffer a physical injury, much less a serious one. Accordingly, Principal McClinchie's conduct does not shock the conscience and thus does not violate D.C.'s constitutional right to be free from excessive force.

Unlike Principal McClinchie, Officer Parker is alleged to have had physical contact with D.C. Specifically, Officer Parker handcuffed D.C. during a particularly disruptive outburst in which D.C. destroyed school property in the hallway, threw objects, pushed staff members, failed to follow directives, and ran from Principal McClinchie. The first prong of the test is met

because, as discussed, using force in reaction to a disruptive student serves a pedagogical objective. Second, D.C. alleges that handcuffing was excessive for the situation because of his age and disability status. Although it is concerning that a small child was handcuffed, the severity of his behavior at the time may have necessitated some form of restraint. Third, the facts, as pleaded in the Complaint, tend to show that Officer Parker's actions were intended to restore order. And, lastly, D.C. does not allege that he suffered any physical injury from being handcuffed by Officer Parker. Officer Parker's conduct thus does not shock the conscience, and she likewise did not violate D.C.'s constitutional right to be free from excessive force.

Lastly, in the District's Motion to Dismiss the *Monell* claims against it, the District argues that the individual Defendants' conduct, including that of Mr. Sible, did not shock the conscience and thus did not violate D.C.'s constitutional right to be free from excessive force. (ECF No. 11, at 10–12). D.C. argues in response that the two incidents involving Mr. Sible, wherein he choked D.C. and he restrained D.C. by placing a knee in D.C.'s back while pressing D.C.'s face into the floor, were "egregious" and conscience-shocking. (ECF No. 26, at 14). Though the choking incident, without more detail, likely did not have a pedagogical justification, Mr. Sible's restraint of D.C. during the other incident perhaps did. Again, D.C. engaged in frequent disruptive and unsafe behavior, including running, so the use of force to restrain him served a pedagogical objective. Next, it is unclear, based on the facts in the Complaint, that the force used was excessive to meet legitimate objectives, given the situations that D.C.'s behaviors created. Third, the facts do not show that Mr. Sible used force on D.C. for the very purpose of causing harm instead of in a good faith effort to maintain or restore discipline. Again, D.C.'s behaviors were such that school officials, like Mr. Sible, were required to intervene in significant ways to restore order and keep D.C. and other students safe. Lastly—and the dispositive element

here—D.C. does not allege that he suffered any physical injury as a result of Mr. Sible's actions, much less a serious physical injury. While unfortunate, Mr. Sible's conduct toward D.C. did not violate D.C.'s constitutional right to be free from excessive force.

Because D.C. does not allege a violation of his constitutional right to be free from excessive force, the Court does not need to analyze the remaining questions in the three-part qualified immunity inquiry, and Principal McClinchie and Officer Parker (and Mr. Sible, though he did not move to dismiss) are entitled to qualified immunity. Consequently, Count VI must be dismissed as to the three individual Defendants.

## C. D.C.'s constitutional claims against the District

In addition to his § 1983 claims against the individual Defendants, D.C. brings four § 1983 against the District, in Counts V, VI, XI, and XII. A municipality, such as a school district, can only be held liable under § 1983 for its own illegal conduct, not for the acts of its employees—"or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). A plaintiff thus must "demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation." *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 175 (3d Cir. 2017). Importantly, if the plaintiff has not first established a violation by an individual, then there can be no derivative claim against the municipality. *Mulholland v. Government Cty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013).

With this in mind, the Court now turns to D.C.'s failure to train/failure to supervise excessive force claim against the District, followed by D.C.'s "*Monell*" claim, and then D.C.'s equal protection claim and state-created danger claim.

i. *Count VI—D.C.'s § 1983 failure to train/failure to supervise excessive force claim*

In Count VI, D.C. alleges that the District "has failed and continues to fail to train and supervise Defendants Parker, Sible, and McClinchie regarding the restrictions under law on the use of physical restraints, including handcuffs, on students with disabilities." (ECF No. 1, at ¶ 129). Inadequate training or supervision may constitute a policy or custom for which a municipality can be held liable under § 1983. *Estate of Adriano Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. Jan. 29, 2019). To establish a municipality's liability on a failure-to-train or failure-to-supervise theory, the plaintiff must first "identify specific acts or omissions of the supervisor that evidence deliberate indifference." *Brown v. Muhlenberg Township*, 269 F.3d 205, 218 (3d Cir. 2001). "A plaintiff sufficiently pleads deliberate indifference by showing that '(1) municipal policymakers know that employees will confront a particular situation[,] (2) the situation involves a difficult choice or a history of employees mishandling[,] and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" *Estate of Adriano Roman*, 914 F.3d at 798 (quoting *Doe v. Luzerne County*, 660 F.3d 169, 180 (3d Cir. 2011)). After establishing the existence of deliberate indifference, the plaintiff must then "persuade the court that there is a relationship between the identified deficiency and the ultimate injury." *Brown*, 269 F.3d at 218.

Presently, D.C. has failed to allege that any of the three individual Defendants violated his constitutional right to be free from excessive force. Thus, even if he establishes that the District has a policy or custom that could lead to the use of excessive force, he has not alleged an "ultimate injury" to himself. Therefore, even if Plaintiffs can amend the Complaint to overcome its jurisdiction defects, Count VI would still be dismissed for failure to state a claim.

ii. *Count V—*Monell *failure to train/failure to supervise claim*

Similar to Count VI, D.C. also alleges in Count V a § 1983 failure to train and failure to supervise claim against the District. Specifically, D.C. alleges that the District has "fail[ed] to train teachers and staff on how to identify students in need of special education, specifically positive behavioral support"; "[i]nappropriate[ly] reli[ed] on school police officers in situations where students with disabilities display[ed] behaviors that are clear manifestations of their disabilities"; "[p]ermit[ted] the use of physical restraints, such as handcuffs, by school police when disciplining students with disabilities in the school setting." (ECF No. 1, at ¶ 119). The problem with this claim, though, is that D.C. does not allege what statutory or constitutional right has been violated. The Court cannot analyze this claim without knowing which right was violated, and thus which standard applies. Perhaps if the Court could glean the specific right from other parts of the Complaint, D.C.'s omission under Count V would not be fatal to the claim, but the Complaint offers no clear clues as to which right is at issue. For example, Count V is captioned as "*Unconstitutional* Policies and Customs," but the District's alleged failures in Count V read as though they are breaches of *statutory*, IDEA-based duties. Additionally, to the extent that Count V is based on the use of excessive force by school officials, it overlaps with the *Monell* claim in Count VI and must be dismissed as duplicative.

Consequently, even if Plaintiffs can establish the Court's subject matter jurisdiction over this claim, it must be dismissed for failure to state a claim.

### iii. Count XI—equal protection claim

Next, the District challenges Count XI, in which D.C. alleges that the District violated the Equal Protection Clause by disproportionately subjecting students of color, including D.C., to physical restraint as a disciplinary measure. (ECF No. 11, at 13). The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its

jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal

Protection Clause protects against, among other things, the selective enforcement of a statute or

policy where such enforcement decisions are based on an unjustifiable standard, such as race.

*Whren v. United States*, 517 U.S. 806, 813 (1996). A plaintiff seeking redress for an equal

protection violation must allege that the treatment he received was different from that received

by other similarly situated individuals. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d

Cir. 2014). The plaintiff must also allege that the discriminatory treatment was purposeful or

intentional. *Id.*; *Hassan v. City of New York*, 804 F.3d 277, 294 (3d Cir. 2015). Significantly, it

is not enough that a plaintiff alleges that he is a member of a protected class and that a statute or

policy was enforced against his protected class more than any other group. *Hassan*, 804 F.3d at

294. Instead, he must allege that his membership in the protected class was a substantial factor

in the differential treatment. *Id.*

  Here, D.C. alleges that students of color who are enrolled in the District, including D.C.,

"are disproportionately subjected to physical restraint in response to disciplinary incidents," and

that "Defendants, together and/or individually, intentionally discriminated against D.C. . . .

because of his race." (ECF No. 1, at ¶¶ 166–67). However, allegations that might connect the

physical restraint used on D.C. to D.C.'s race are sparse, to the extent that they exist at all.

Throughout the facts alleged in the Complaint, Plaintiffs only provide two facts related to race.

First, Grandfather observed that D.C. and one other student of color were made to sit at desks

facing a wall, but no white students were made to face the wall during Grandfather's visit. *Id.* at

¶¶ 63, 138. Second, Plaintiffs allege that they noted the use of school police officers as a

disciplinary measure for other students of color. *Id.* at ¶ 137. In his claims, D.C. otherwise only

provides conclusory allegations that the District used school police as a disciplinary measure

during his outbursts because of his race. D.C. does not allege how similarly situated students—that is, non-African-American students who present the same or similar behavioral difficulties as D.C.—were treated differently from him, or any other facts that might indicate racial animus was a substantial factor in the decision to call school police. Therefore, D.C. fails to allege facts regarding the treatment of similarly situated student, and he fails to allege facts that show purposeful or intentional discrimination. As such, Count XI must be dismissed for failure to state a claim.

### iv. Count XII—state-created danger claim

The District next seeks dismissal of Count XII, the last of D.C.'s constitutional claims, in which D.C. alleges that the District violated D.C.'s Fourteenth Amendment rights under the state-created danger theory of liability. The Fourteenth Amendment's Due Process Clause prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. However, it "does not generally impose an affirmative obligation upon states to protect individuals from private citizens." *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013). The state-created danger theory is a narrow exception to this general rule, wherein the government can be held liable for harm caused by a private actor if the government affirmatively used its authority to create a danger or render the plaintiff more vulnerable to danger. *Id.* at 167, 177.

Here, D.C. does not allege any conduct occurring on the part of any private actors, much less that he suffered any harm or injury at the hands of a private actor. All of the conduct with which D.C. finds fault and that he alleges caused him harm belonged to state actors. Therefore, the state-created danger exception is irrelevant, and even assuming Plaintiffs correct the jurisdictional defects of the Complaint, Count XII must be dismissed for failure to state a claim.

D. D.C.'s state law claims

The last of D.C.'s claims are his state law claims. In Count IX, D.C. brings a claim of common law intentional infliction of emotional distress against the three individual Defendants, and in Count VII, he brings a claim under the PHRA against the District.

*i. Count IX—intentional infliction of emotional distress claim*

Principal McClinchie and Officer Parker seek dismissal of Count IX, on the ground that D.C. has not plausibly alleged a claim for intentional infliction of emotional distress against them. (ECF No. 22, at 10–13; ECF No. 25, at 10–13). A claim for intentional infliction of emotion distress requires the plaintiff to plead facts that show that (1) the conduct at issue was extreme and outrageous; (2) the conduct was done intentionally or recklessly; (3) the conduct caused emotional distress; and (4) the resultant distress was severe. *Gray v. Huntzinger*, 147 A.3d 924, 927 (Pa. Super. Ct. 2016). As to the first element, "the court is to decide as an initial matter whether the conduct at issue can reasonably be regarded as sufficiently extreme to constitute 'outrageousness' as a matter of law." *Martin-Mcfarlane v. City of Phila.*, 299 F. Supp. 3d 658, 671 (E.D. Pa. 2017) (internal quotations omitted). But, "[i]f reasonable persons may differ, the issue goes to the jury, subject to the control of the court, to determine whether the conduct is sufficiently extreme and outrageous to incur liability." *Jordan v. City of Phila.*, 66 F. Supp. 2d 638, 642 (E.D. Pa. 1999) (citing Restatement (Second) of Torts § 46, cmt. h). Courts have thus looked to whether the conduct is "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in any civilized society." *Reardon v. Allegheny College*, 926 A.2d 477, 488 (Pa. Super. Ct. 2007) (internal quotations omitted). Next, regarding the second element, the plaintiff

must plead facts showing that the defendant had "knowledge . . . that severe emotional distress [was] substantially certain to be produced by his conduct." *Ross v. Borough of Dormont*, 937 F. Supp. 2d 638, 655 (W.D. Pa. 2013) (internal quotations omitted). As to the fourth element, the plaintiff must allege that the emotional distress was severe, such that he suffered "some type of resulting physical harm due to the defendant's outrageous conduct." *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122 (Pa. Super. Ct. 2004); *Eck v. Oley Valley Sch. Dist.*, 2019 U.S. Dist. LEXIS 137743, at *20 n.98 (E.D. Pa. Aug. 15, 2019).

Principal McClinchie and Officer Parker each contend that D.C. has not plausibly alleged that their conduct was extreme and outrageous or that D.C.'s distress was severe. Principal McClinchie is only alleged to have restrained D.C. to a room in an attempt to prevent him from eloping and to quell the disturbance D.C. was causing. It appears, based on the facts in the Complaint, Principal McClinchie's conduct was for the purpose of keeping D.C. and the other students safe. Similarly, Officer Parker restrained D.C. from further harming himself or others by handcuffing him. Confining a child to a small room and handcuffing a child are unfortunate situations, but given the circumstances of D.C.'s behavior, neither Principal McClinchie's nor Officer Parker's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." Furthermore, even if reasonable persons might differ on the issue of outrageousness, which would require the issue to go to a jury, the claim still fails on the fourth element. Although D.C. alleges that he has been diagnosed with PTSD, he does not allege any physical manifestation of his emotional distress. Consequently, D.C. fails to state a claim for intentional infliction of emotional distress against Principal McClinchie and Officer Parker, and Count IX must be dismissed.

*ii. Count VII—PHRA claim*

As to D.C.'s PHRA claim against the District, the District only seeks dismissal on the basis that, should the Court dismiss the federal claims, the Court should decline to exercise its supplemental jurisdiction over D.C.'s state law claims. Although all federal claims will be dismissed, Plaintiffs will be given the opportunity to amend their Complaint. Accordingly, the Court, in its discretion, will continue to exercise supplemental jurisdiction over D.C.'s state law claims at this time.

E. Mother and Grandfather's statutory claims

In Counts III and IV of the Complaint, Mother and Grandfather claim that because of their association with D.C., the District discriminated against them in violation of § 504 of the Rehabilitation Act and the ADA. The District argues that Mother and Grandfather have each failed to state a claim for associational discrimination under these statutes.

Under both the Rehabilitation Act and the ADA, non-disabled persons may bring claims when they are injured because of their association with a disabled person. *T.C. v. Hempfield Area Sch. Dist.*, 2018 U.S. Dist. LEXIS 130817, at *21 (W.D. Pa. Aug. 3, 2018). To state an associational discrimination claim, a plaintiff must allege, first, that he has "a logical and significant association with an individual with disabilities." *Id.* at *22 (internal quotations omitted). Second, the plaintiff must allege that the defendant, a public entity, knew of that association. *Id.* Next, the defendant must have discriminated against the plaintiff because of that association. *Id.* Fourth, the plaintiff must have "suffered a direct injury as a result of the discrimination." *Id.* Discrimination based on association thus "requires a separate and distinct denial of a benefit or service to a non-disabled person; it may not be premised on a derivative benefit or harm based on treatment towards a disabled person." *Id.* (internal quotations omitted).

The District first challenges Grandfather's associational discrimination claims on the basis that "Plaintiffs have not included specific factual averments which support a 'significant' association between" Grandfather and D.C. (ECF No. 11, at 6). However, Plaintiffs plead facts showing that Grandfather, despite living several hours away, regularly participates in D.C.'s care and education, including observing D.C. in school over two days, attending meetings at D.C.'s school, and advocating for D.C. and Mother. Grandfather therefore has "a logical and significant association with" D.C.

The District next challenges both Mother's and Grandfather's associational discrimination claims on the ground that they are derivative of D.C.'s § 504 and ADA claims, and do not allege distinct, direct harm to Mother and Grandfather. (ECF No. 11, at 6). Mother and Grandfather claim that the District discriminated against them "by continuously failing to provide sufficient behavioral support and interventions, despite [Mother] and [Grandfather]'s constant efforts and requests, to allow D.C. to access his education." (ECF No. 1, at ¶ 110). Mother and Grandfather also allege that the District's decision to ignore their concerns "directly resulted in D.C. being denied appropriate behavior support, as well as access to a free, appropriate public education." *Id.* at ¶ 111. Mother alleges that her "direct injury" is that she has suffered stress, anxiety, "extreme guilt," and depression "after witnessing the impact the events described herein have had and continue to have on D.C." *Id.* at ¶ 112. Similarly, Grandfather alleges that his "direct injury" is also that he has had "to witness both his daughter and his grandson suffer because of the District's actions," and that he has suffered the financial strain of traveling and missing work to be with his daughter and grandson. *Id.* at ¶ 113. The Court has no doubt that the stress of D.C.'s kindergarten and first grade years took a toll on Mother and Grandfather, but the injuries they allege are not "direct injuries," as required for

associational discrimination claims. Instead, Mother and Grandfather allege indirect, or derivative, injuries that occurred as a result of the District's actions toward D.C., not as a result of actions directed at Mother and Grandfather. Consequently, even assuming Plaintiffs cure the jurisdictional defects of the Complaint, Mother's associational claims in Counts III and IV fail to state a claim. And, Grandfather's associational claims in Counts III and IV, over which the Court has subject matter jurisdiction, will be dismissed for failure to state a claim.

F. Mother and Grandfather's constitutional claim

Lastly, the District seeks dismissal of Count XIII, in which Mother brings a § 1983 claim for violation of her Fourteenth Amendment liberty interests in the parenthood and companionship of D.C. and in the maintenance and integrity of her family. Grandfather joins Count XIII with an identical § 1983 claim, alleging a violation of his Fourteenth Amendment liberty interests in the parenthood and companionship of Mother, as well as the companionship of D.C., and in the maintenance and integrity of his family. The District seeks dismissal of Count XIII on the ground that Mother and Grandfather have failed to plead a colorable cause of action.

The Due Process Clause of the Fourteenth Amendment "'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). One of the oldest fundamental liberty interests recognized by the Supreme Court is "the interest of parents in the care, custody, and control of their children." *Id.* This interest includes the right of parents and guardians "'to direct the upbringing and education of children under their control.'" *Id.* (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925)). However, this

liberty interest does "not extend to a parent's interest in the companionship of his independent adult child." *McCurdy v. Dodd*, 352 F.3d 820, 830 (3d Cir. 2003).

Historically, the guarantees of the Due Process Clause have "been applied only to '*deliberate* decisions of government officials to deprive a person of life, liberty, or property.'" *Id.* at 827 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Regarding parental liberty interests, "the Due Process Clause only protects against deliberate violations of a parent's fundamental rights—that is, where the state action at issue was specifically aimed at interfering with protected aspects of the parent-child relationship." *Id.* at 827–28. The Third Circuit has also explained that a conflict between school policy and "parents' liberty interest will not be lightly found, and, indeed, only occurs when there is some manipulative, coercive, or restraining conduct by the State." *J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 933–34 (3d Cir. 2011) (internal quotations omitted). Stated differently, "the parents' liberty interest will only be implicated if the state's action deprived them of their right to make decisions concerning their child, and not when the action merely complicated the making and implementation of those decisions." *Id.* at 934 (internal quotations omitted).

First, as to Grandfather, he alleges liberty interests based on his relationship with Mother, who is his daughter, and based on his relationship with D.C., his grandchild. However, Mother is an independent adult, and the Due Process Clause's guarantees do not extend to Grandfather's relationship with Mother. Additionally, the Complaint contains no allegations regarding Grandfather's legal relationship with D.C., in that Plaintiffs do not plead any facts showing that Grandfather has any right to have care, custody, or control over D.C. Grandfather thus does not have a Fourteenth Amendment liberty interest in his relationship with D.C. Because Grandfather

does not plead the existence of a cognizable right or interest under the Due Process Clause, his claim in Count XIII cannot stand.

Second, Mother, who has cognizable liberty interest in the care, custody, and control of her son, D.C., alleges that the District's failure to adequately support D.C. caused D.C.'s victimization by school police and staff, which in turn caused the loss and diminution of her liberty interest. This chain of events, which starts with a failure to act, is too attenuated to be the deliberate decision to deprive or interfere that is required to state a claim under the Fourteenth Amendment's Due Process Clause. Consequently, even if Plaintiffs plead facts showing the Court's subject matter jurisdiction over Mother's claim, this claim must be dismissed for failure to state a claim.

## IV. Conclusion

Based on the foregoing, it is hereby ORDERED that Defendant Pittsburgh Public School's (the District's) Motion to Dismiss for lack of subject matter jurisdiction is GRANTED; that certain other claims are dismissed, sua sponte, for lack of subject matter jurisdiction (as detailed below); that Defendant Pittsburgh Public School's Motion to Dismiss for failure to state a claim is GRANTED IN PART, DENIED IN PART, and MOOT IN PART; that Defendant Marion Parker's Motion to Dismiss for failure to state a claim is GRANTED; and that Defendant Mark McClinchie's Motions to Dismiss for failure to state a claim is GRANTED, such that:

1. Count I is dismissed for lack of subject matter jurisdiction, as to both Plaintiff D.C.'s claim and the putative class claim;

2. Count II is dismissed for lack of subject matter jurisdiction, as to both Plaintiff D.C.'s claim and the putative class claim;

3. As to Count III, Plaintiff A.T.'s (Mother's) claim is dismissed for lack of subject matter jurisdiction, and Plaintiff F.T.'s (Grandfather's) claim is dismissed for failure to state a claim;

4. As to Count IV, Plaintiff A.T.'s (Mother's) claim is dismissed for lack of subject matter jurisdiction, and Plaintiff F.T.'s (Grandfather's) claim is dismissed for failure to state a claim;

5. Count V is dismissed for lack of subject matter jurisdiction;

6. Count VI, as it pertains to Defendant Pittsburgh Public Schools (the District), is dismissed for lack of subject matter jurisdiction. Count VI, as it pertains to Defendants Marion Parker, Mark McClinchie, and Nicholas Sible, is dismissed for failure to state a claim;

7. Count VII remains, as the Court, in its discretion, will continue to exercise supplemental jurisdiction over this claim;

8. Count VIII is dismissed for failure to state a claim;

9. Count IX, as it pertains to Defendants Marion Parker and Mark McClinchie, is dismissed for failure to state a claim. The claim against Defendant Nicholas Sible in Count IX remains;

10. Count X is dismissed for failure to state a claim;

11. Count XI is dismissed for failure to state a claim;

12. Count XII is dismissed for lack of subject matter jurisdiction; and

13. As to Count XIII, Plaintiff A.T.'s (Mother's) claim is dismissed for lack of subject matter jurisdiction, and Plaintiff F.T.'s (Grandfather's) claim is dismissed for failure to state a claim.

FURTHERMORE, Plaintiffs shall have until **December 23, 2019** to amend their Complaint in accordance with this Opinion.

IT IS SO ORDERED.

DATE ___December 3, 2019___

_____
Marilyn J. Horan
United States District Judge