**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

D.C., *a minor, by and through*                  )
*his mother, A.T.*,                                      )
                                                                )          2:19-cv-12
                            Plaintiff,                    )
                                                                )
                            v.                               )          Judge Marilyn J. Horan
                                                                )
PITTSBURGH PUBLIC SCHOOLS,         )
                                                                )
                            Defendant.                 )

**MEMORANDUM OPINION**

In January 2019, Plaintiffs, D.C., A.T., and F.T., filed suit against Defendants, Pittsburgh

Public Schools (the District), Marion Parker, Nicholas Sible, and Mark McClinchie.  (ECF No.

1).  In their original Complaint, Plaintiffs sought relief pursuant to Section 504 of the

Rehabilitation Act of 1973, the Americans with Disabilities Act (ADA), the Pennsylvania

Human Relations Act (PHRA), Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1983, and

Pennsylvania common law for intentional infliction of emotional distress.  (ECF No. 1).

On December 3, 2019, this Court issued an Opinion and Order with regard to the

District's, Officer Parker's, and Principal McClinchie's Motions to Dismiss.  (ECF No. 42).

Following said Order, the only remaining claims were D.C.'s Count VII, PHRA claims against

the District, and D.C.'s Count IX, intentional infliction of emotional distress claim, against Mr.

Sible.  (ECF No. 42).

On January 15, 2020, D.C. filed an Amended Complaint against the District and Mr.

Sible.  (ECF No. 47).  On June 15, 2020, this Court issued an Opinion and Order with regard to

the District's and Mr. Sible's Motions to Dismiss.  (ECF No. 68).  Following said Order, the only

remaining claims were D.C.'s Count I, Section 504, and Count VII, PHRA, claims against the

District.  (ECF No. 68).

Discovery has been completed, and the Plaintiff and the Defendant have each filed a Motion for Summary Judgment.  (ECF Nos. 101 & 104).  The present Motions for Summary Judgment have been fully briefed, and the Motions are now ripe for decision.  (ECF Nos. 101, 102, 103, 104, 105, 106, 115, 116, 117, 118, 119, 120, 121, 122).

Based on the following reasoning, Plaintiff's Motion for Summary Judgment will be denied.  Defendant's Motion for Summary Judgment will be granted in part and denied in part.  Defendant's Motion for Summary Judgment will be granted as to Plaintiff's Count VII, PHRA racial discrimination claims, and judgment will be entered in favor of Defendant on said claims.  The District's Motion for Summary Judgment will be denied as to Plaintiff's Count I, Section 504 disability discrimination claim, and Count VII, PHRA disability discrimination claim.

I.      **Facts**

a.      **2015-2016 School Year**

D.C. was enrolled in the District for the 2015-2016 school year as a kindergarten student at Liberty Elementary School.  (ECF Nos. 106, at ⁋ 1; 119, at ⁋ 1).  On December 18, 2015, D.C.'s mother, A.T., picked him up early from school after the District reported that he hit another student.  (ECF Nos. 106, at ⁋ 9; 119, at ⁋ 9).  D.C.'s behaviors continued to increase, resulting in the school counselor, Ms. Nichols, frequently contacting A.T.  (ECF Nos. 106, at ⁋ 10; 119, at ⁋ 10).  D.C.'s kindergarten teacher, Ms. Matthews, completed incident report sheets in response to D.C.'s behaviors.  (ECF Nos. 106, at ⁋ 11; 119, at ⁋ 11).  Ms. Matthews reported that D.C. had hit students with his belt on the playground during recess, refused to follow directions, shouted at her in the classroom, and eloped from the classroom when upset.  (ECF Nos. 106, at ⁋⁋ 12-14; 119, at ⁋ 12-14).  In response to these behaviors, Ms. Matthews referred

D.C. to Ms. Nichols and requested a parent-teacher conference.  (ECF Nos. 106, at ℙ 17; 119, at ℙ 17; 107-3, at 3).

In February 2016, Ms. Matthews again referred D.C. to Ms. Nichols after D.C. verbally threatened his classmates.  (ECF Nos. 106, at ℙ 18; 119, at ℙ 18).  On February 18, 2016, Ms. Nichols told A.T. that D.C. had made verbal threats to other students.  (ECF Nos. 106, at ℙ 19; 119, at ℙ 19).  On that same day, Ms. Nichols testified, and school records show, that Ms. Nichols sent paperwork to A.T. regarding the Student Assistance Program (SAP).  (ECF Nos. 106, at ℙ 20; 119, at ℙ 20; 107-1, at 125-26; 107-3, at 2).[1]  A.T. does not remember receiving this documentation about the SAP program in February 2016.  (ECF No. 107-1, at 8-10).  According to Ms. Nichols' testimony, the SAP program is "typically the school team which was compiled of a variety of school staff members [and] teachers that would discuss behaviors or additional supports that a student may need."  (ECF Nos. 106, at ℙ 21; 119, at ℙ 21; 107-1, at 126).

The District also has the Multi-Tier System Support Services (MTSS) program to identify students with "academic difficulties, behavioral, social or emotional concerns" and to evaluate students to determine their eligibility for special education.  (ECF No. 107-1, at 129).  The MTSS team at Liberty Elementary consists of the special education teachers, the school psychologist, the school counselor, and school administrators.  (ECF No. 107-1, at 130).  The homeroom teachers would rotate each week to discuss any students that they had concerns about. (ECF No. 107-1, at 130).  The MTSS and SAP programs are two distinct programs at Liberty Elementary.  (ECF No. 107-1, at 130).  Ms. Nichols explained that whenever there started to be a lot of discipline referrals for a particular student or if a student was in the process of being

---

[1] Ms. Nichols' records from February 18, 2016 indicate that she "Resent SAP Info."  (ECF No. 107-3, at 2).  The record contains no evidence of any sending or receipt of any prior SAP information.

3

potentially evaluated, she would start collecting behavioral information and data for the MTSS program.  (ECF No. 107-1, at 130).

On February 23, 2016, A.T. met with Ms. Nichols regarding D.C.'s escalating behaviors. (ECF Nos. 106, at ⁋ 23; 119, at ⁋ 23).  At this meeting, A.T. agreed to secure outpatient therapy services for D.C.  (ECF Nos. 106, at ⁋ 24; 119, at ⁋ 24).

On March 15, 2016, D.C. refused to come to the classroom, and when Ms. Matthews was finally able to get him to come into the classroom, he screamed and cried.  (ECF Nos. 106, at ⁋ 27; 119, at ⁋ 27).  These behaviors persisted throughout the day, and ultimately a paraprofessional intervened.  (ECF Nos. 106, at ⁋ 28; 119, at ⁋ 28).  D.C. also attempted to kick and scratch the paraprofessional.  (ECF Nos. 106, at ⁋ 29; 119, at ⁋ 29).  Ms. Nichols contacted A.T. and informed her of a "crisis situation" involving D.C.  (ECF No. 107-3, at 2).

After this incident, Ms. Matthews recommended scheduling a team meeting with D.C.'s family to develop a safety plan for D.C.  (ECF No. 107-7, at 9).  The team meeting was scheduled to occur on March 16, 2016.  (ECF Nos. 106, at ⁋ 32; 119, at ⁋ 32).

On March 16, 2016, the day of the meeting, D.C. refused to follow Ms. Matthews' directions, stay in the classroom, or remain in line with his classmates.  (ECF Nos. 106, at ⁋ 33; 119, at ⁋ 33).  D.C. also threw his shoes, screamed, and cried multiple times during the day. (ECF Nos. 106, at ⁋ 34; 119, at ⁋ 34).

At the team meeting, Ms. Nichols reported that D.C. often cried and screamed, ran out of the classroom, and threw objects during the school day.  (ECF Nos. 106, at ⁋ 36; 119, at ⁋ 36). Ms. Nichols also reported that D.C. had recently began to hit other students.  (ECF Nos. 106, at ⁋ 36; 119, at ⁋ 36).  A.T. also reported that she had recently begun to see some defiant behaviors from D.C. at home.  (ECF Nos. 106, at ⁋ 37; 119, at ⁋ 37).  It was determined at the March 16,

2016 meeting that D.C. would receive sensory breaks during the school day and his teachers would use emotion charts to help control his behavior. (ECF Nos. 106, at ⁋ 39; 119, at ⁋ 39; 107-4, at 5).

D.C.'s behaviors continued throughout the rest of his kindergarten year. (ECF Nos. 106, at ⁋⁋ 43-52; 119, at ⁋⁋ 43-52). Although the possibility of outpatient therapy was first discussed at the February 23, 2016 meeting, D.C. was not able to get an outpatient therapy appointment with Mercy Behavioral Health until July 2016. (ECF Nos. 107-1, at 12; 107-15, at 3). A.T. explained that D.C. did not continue with outpatient therapy very long that summer, and that the sessions concluded by the beginning of his first-grade year because "[h]is therapist at the time didn't see much that she needed to do to help him." (ECF Nos. 107-1, at 12; 107-15, at 3).

**b. 2016-2017 School Year**

In August 2016, D.C. began first grade at Liberty Elementary. (ECF Nos. 106, at ⁋ 55; 119, at ⁋ 55). D.C. continued to experience behavioral difficulties during his first-grade year. (ECF Nos. 106, at ⁋ 56; 119, at ⁋ 56). On September 2, 2016, Ms. Nichols called A.T. regarding "services and medication management." (ECF Nos. 106, at ⁋ 58; 119, at ⁋ 58).

On September 16, 2016, D.C. was involved in an altercation with another student. (ECF Nos. 106, at ⁋ 60; 119, at ⁋ 60). After the September 16, 2016 incident, the District suspended D.C. for two days. (ECF Nos. 106, at ⁋ 61; 119, at ⁋ 61). Ms. Nichols called and emailed A.T. to make her aware of the incident and provided A.T with the behavior charts from D.C.'s teachers. (ECF Nos. 106, at ⁋ 62; 119, at ⁋ 62).

After this incident, the District moved D.C. from his original classroom into Mr. Sible's classroom. (ECF Nos. 106, at ⁋⁋ 63, 65; 119, at ⁋⁋ 63, 65). On September 21, 2016, Ms. Nichols emailed A.T. the paperwork for the SAP program. (ECF Nos. 106, at ⁋ 66; 119, at ⁋ 66).

That same day, Ms. Nichols had a meeting with D.C.'s first-grade teachers where she shared that D.C. might need additional interventions. (ECF Nos. 106, at ₱₱ 68-69; 119, at ₱₱ 68-69). Ms. Nichols provided sensory buckets to each of D.C.'s teachers and recommend the use of behavior charts during the school day. (ECF Nos. 106, at ₱ 70; 119, at ₱ 70; 107-2, at 4). Ms. Nichols also explained at the meeting that "a referral to MTSS/SAP should be made if additional concerns [persisted] after these interventions." (ECF Nos. 106, at ₱ 71; 119, at ₱ 71; 107-2, at 4).

On September 22, 2016, D.C. was given a two-day bus suspension for stabbing another student and a seat with a pencil on the bus. (ECF Nos. 106, at ₱₱ 72-73; 119, at ₱₱ 72-73). On September 26, 2016, District staff contacted A.T. to follow-up on D.C.'s behaviors and to remind her to return the SAP paperwork. (ECF Nos. 106, at ₱ 74; 119, at ₱ 74).

On October 5, 2016, Western Psychiatric Institute and Clinic conducted a psychiatric evaluation of D.C., ultimately resulting in diagnoses of Attention Deficit/Hyperactivity Disorder (ADHD), Predominately Hyperactivity-Impulsive Type and Oppositional Defiant Disorder (ODD). (ECF Nos. 106, at ₱ 75; 119, at ₱ 75). A.T. shared this information with the District. (ECF Nos. 106, at ₱ 75; 119, at ₱ 75).

On October 6, 2016, D.C. had difficulty following directions, hit several students, and "pulled on Mr. Sible." (ECF Nos. 106, at ₱ 76; 119, at ₱ 76). On the bus that afternoon, D.C. was hanging out the window and spitting, had difficulty following directions, did not stay in his seat, and displayed "disrespectful behavior." (ECF Nos. 106, at ₱ 77; 119, at ₱ 77). As a result, D.C. was giving another one-day bus suspension. (ECF Nos. 106, at ₱ 78; 119, at ₱ 78).

On October 11, 2016, Ms. Nichols "[e]mailed Mr. Sible regarding MTSS documentation needing to be completed & MTSS Meeting notice was sent to staff." (ECF Nos. 106, at ₱ 79; 119, at 79; 107-2, at 4).

On October 13, 2016, D.C. repeatedly jumped on Mr. Sible during class.  (ECF Nos. 106, at ₱ 83; 119, at ₱ 83).  When Mr. Sible reprimanded D.C., D.C. started yelling.  (ECF Nos. 106, at ₱ 84; 119, at ₱ 84).  D.C. then went over to his desk and threw his desk and his chair approximately five feet.  (ECF Nos. 106, at ₱ 85; 119, at ₱ 85).  D.C. spent the remainder of the school day in Ms. Nichols' office.  (ECF Nos. 106, at ₱ 86; 119, at ₱ 86).  D.C. was sent home from school and received a bus suspension.  (ECF Nos. 106, at ₱ 87; 119, at ₱ 87).

When A.T. asked D.C. why he had become so frustrated in the classroom that day, he told her that "he was angry because the teacher put his teeth on the ground."  (ECF No. 107-1, at 31).  D.C. told his mother that "the teacher had his knee on his back and as he was putting him— his knee on his back, he also pushed his head and it made him hit his mouth on the ground."  (ECF No. 107-1, at 31).  Another teacher reported this incident with Mr. Sible to ChildLine, the child abuse hotline, because it appeared to that teacher that Mr. Sible was "choking" D.C.  (ECF Nos. 106, at ₱ 90; 119, at ₱ 90; 107-1, at 31-32).[2]

On October 14, 2016, an unplanned meeting took place with A.T., during which time concerns about D.C. in the classroom were discussed.  (ECF Nos. 106, at ₱ 91; 119, at ₱ 91).  A.T. also signed the SAP documents during this meeting.  (ECF Nos. 106, at ₱ 92; 119, at ₱ 92).

By late October 2016, A.T. stated in her deposition testimony that D.C.'s behaviors began to worsen.  (ECF No. 107-1, at 34).  She received phone calls from the District regarding D.C.'s behavior "several times a week."  (ECF No. 107-1, at 34).  She further testified that "[t]he frequent calls started in late October into January, and I at least got over a hundred phone calls

---

[2] Based upon the record before the Court, it does not appear that anything further came of the October 13, 2016 ChildLine Report.

within that." (ECF No. 107-1, at 34).  A.T. would have to pick D.C. up from school after most of these phone calls from the District.  (ECF No. 107-1, at 34-35).

On October 18, 2016, D.C. had a medication management appointment at Western Psychiatric Institute and Clinic, where he was prescribed Adderall.  (ECF Nos. 106, at ₱ 94; 119, at ₱ 94).  A.T. told the District about D.C.'s new Adderall prescription.  (ECF Nos. 106, at ₱ 94; 119, at ₱ 94; 107-3, at 4).

On October 21, 2016, D.C. threw shoes and a garbage can and pushed Mr. Sible and his classmates. (ECF Nos. 106, at ₱ 106; 119, at ₱ 106).  D.C. also ran around the classroom and took writing utensils from his classmates while they were taking a test.  (ECF Nos. 106, at ₱ 107; 119, at ₱ 107).  On the way to lunch, D.C. struggled to wait in line and pushed and shoved his classmates.  (ECF Nos. 106, at ₱ 108; 119, at ₱ 108).  In response, the District called A.T. and told her that D.C. needed to be picked up early from school, and that D.C. had received a one-day suspension from school.  (ECF Nos. 106, at ₱₱ 109-10; 119, at ₱₱ 109-10).  When A.T. was not able to arrive at the school quickly enough to pick up D.C., Principal McClinchie called A.T. to let her know that he would be transporting D.C. home.  (ECF Nos. 106, at ₱₱ 111-12; 119, at ₱₱ 111-12).  A school police officer and Principal McClinchie escorted D.C. home in the school police officer's vehicle.  (ECF Nos. 106, at ₱ 112; 119, at ₱ 112).

On October 25, 2016, D.C. began working with the school psychologist, Dr. Adriana Perdue, in Social Skills Group.  (ECF Nos. 106, at ₱ 114; 119, at ₱ 114; 107-2 at 5).

On October 28, 2016, D.C. shoved his classmates and threw objects during a movie. (ECF Nos. 106, at ₱ 121; 119, at ₱ 121).  D.C. then ran from the room screaming, and the District contacted A.T. again.  (ECF Nos. 106, at ₱ 122; 119, at ₱ 122).  D.C. became escalated when Mr. Sible reprimanded him.  (ECF Nos. 106, at ₱ 123; 119, at ₱ 123).  Mr. Sible told D.C. that he

would lose his recess privileges, and D.C. struck Mr. Sible and attempted to push him over a cabinet. (ECF Nos. 106, at ⁋ 94; 119, at ⁋ 124). Mr. Sible sought assistance from Principal McClinchie, and they took D.C. outside. (ECF Nos. 106, at ⁋ 125; 119, at ⁋ 125). D.C. then climbed on a stone ledge and attempted to walk over a 30-foot stairwell. (ECF Nos. 106, at ⁋ 126; 119, at ⁋ 126). The District contacted the school police and A.T. (ECF Nos. 106, at ⁋ 127; 119, at ⁋ 127). D.C. was suspended for three days as a result of this incident, and Ms. Nichols recommended that D.C. be involuntarily committed and subject to a 302 assessment. (ECF Nos. 106, at ⁋ 128; 119, at ⁋ 128).

On October 31, 2016, D.C. received a Disruption of School—Suspension Letter for a one-day suspension from Principal McClinchie. (ECF Nos. 106, at ⁋ 130; 119, at ⁋ 130). On October 31, 2016, A.T. and her father, F.T., met with District staff, and during that meeting, they requested that D.C. be evaluated to determine his eligibility for special education services and supports. (ECF Nos. 106, at ⁋ 131; 119, at ⁋ 131; 107-4, at 9; 107-15, at 3). A.T. and F.T. also agreed to permit the District to refer D.C. to Family Links. (ECF Nos. 106, at ⁋ 132; 119, at ⁋ 132). Family Links typically provided therapy services in the school setting, but they also had other services such as medication management and evaluation with a psychiatrist. (ECF Nos. 106, at ⁋ 133; 119, at ⁋ 133).[3] At the October 31, 2016 meeting it was also determined that F.T. would observe D.C. in the classroom over the next two days. (ECF Nos. 106, at ⁋ 135; 119, at ⁋ 135).

On November 1, 2016, F.T. observed D.C.'s classroom, which he described as "complete chaos." (ECF Nos. 106, at ⁋⁋ 136-37; 119, at ⁋⁋ 136-37; 107-1, at 62; 107-14 at 3). He also

---

[3] D.C. completed his intake assessment with Family Links on December 7, 2016 but was ultimately discharged from treatment because he was already receiving mental health treatment from the ADHD Clinic at Western Psychiatric Institute and Clinic. (ECF No. 107-15, at 4).

observed that D.C.'s desk was turned towards the wall, facing away from the teacher.  (ECF Nos. 106, at ¶¶ 136-37; 119, at ¶¶ 136-37; 107-1, at 62).  F.T. stated that he "noticed that there were - - there were maybe three boys and one girl and all of their desks, all of the African-American boys' desks were turned to the wall, facing the wall.  So in order for them to get their education they would have to physically turn around.  There was a Caucasian girl who also's [sic] desk was up against the wall, and she was facing the classroom, and I noticed complete chaos in the classroom.  My grandson being one of these kids whose desk was facing a wall."  (ECF No. 107-1, at 62).  F.T. also observed that D.C. had "a certain defiance about him" and that "he was trying to contain it but his ability to not contain himself was obvious."  (ECF No. 107-1, at 65).  F.T. asked Mr. Sible about the positioning of the desks, and F.T. reported that Mr. Sible told him that it was set up that way because the students had been acting out.  (ECF No. 107-1, at 63).

On November 1, 2016, D.C. also attended Social Skills Group with Dr. Perdue, where he was well behaved.  (ECF No. 107-2, at 6).

On November 1, 2016, the District implemented a Crisis Plan for D.C.  (ECF Nos. 106, at ¶ 141; 119, at ¶ 141).  D.C.'s Crisis Plan was developed "based off of prior conversations with the teacher as well as, like, behaviors that were observed in the classroom setting, these interventions were recommended to potentially help support the student at the time."  (ECF No. 107-1, at 150).  D.C.'s Crisis Plan included school police as a possible intervention to be used as a "last resort option."  (ECF Nos. 106, at ¶ 142; 119, at ¶ 142; 107-1, at 151; 107-10, at 5-6).  Ms. Nichols stated that school police are included as a possible intervention in all Crisis Plans developed by the District.  (ECF Nos. 106, at ¶ 143; 119, at ¶ 143; 107-1, at 150-51).  After the meeting, Ms. Nichols emailed a copy of D.C.'s Crisis Plan to A.T.  (ECF Nos. 107-2, at 5; 107-10, at 4).

On November 2, 2016, the "Primary MTSS/SAP Team" held a MTSS Team Planning meeting, but the teacher was "unprepared with no docs," and the team was "still waiting on notes from Secretary due to no teacher form."  (ECF Nos. 106, at ¶ 144; 119, at ¶ 144; 107-2, at 6). On this same day, Ms. Nichols also sent the Permission to Evaluate (PSE) Form home with D.C. (ECF Nos. 106, at ¶ 145; 119, at ¶ 145; 107-2, at 6).  Ms. Nichols also emailed A.T. the Procedural Safeguards Letter and Procedural Safeguard.  (ECF Nos. 106, at ¶ 145; 119, at ¶ 145; 107-2, at 6).  On November 9, 2016, Ms. Nichols contacted A.T. again "to remind about PSE documents."  (ECF No. 107-2, at 6).  Ms. Nichols' notes indicate that A.T. told her that she "will complete the information after reviewing with representative."  (ECF No. 107-2, at 6).

On November 10, 2016, Ms. Nichols coordinated a meeting for the staff working with D.C.  (ECF Nos. 106, at ¶ 151; 119, at ¶ 151).  During this meeting, Ms. Nichols reported that D.C. was displaying attention-seeking behaviors and that he was not responding to calming activities.  (ECF Nos. 106, at ¶ 152; 119, at ¶ 152).  She also noted that he was taking medication and that behavior charts, sensory activities, and a Crisis Plan were already being implemented. (ECF Nos. 106, at ¶ 153; 119, at ¶ 153).  Ms. Nichols explained that D.C.'s "triggers" were "non-preferred tasks."  (ECF Nos. 106, at ¶ 154; 119, at ¶ 154; 107-4, at 11).  Staff offered additional suggestions at the meeting, including the use of check-ins/check-outs each day, a picture chart, paraprofessional supports, scheduled breaks, and a timer.  (ECF Nos. 106, at ¶ 155; 119, at ¶ 155).

On November 16, 2016, D.C. was running in the hall with a classmate.  (ECF Nos. 106, at ¶ 156; 119, at ¶ 156).  In response, A.T. was again contacted, and D.C. was given an in-school suspension.  (ECF Nos. 106, at ¶ 157; 119, at ¶ 157).

On November 17, 2016, D.C. had "difficulty keeping his hands to himself" and refused to let other students down the aisle on the bus, which resulted in a one-day bus suspension. (ECF Nos. 106, at ⁋ 159; 119, at ⁋ 159).

D.C.'s Evaluation Report, which was eventually completed by the school psychologist on January 26, 2017 stated that D.C. has been "provided one-on-one paraprofessional services since November 21, 2016." (ECF No. 107-15, at 5). A.T. stated in her deposition that "[t]o my understanding the paraprofessional wasn't assigned to my son. I was told that he was for the school. He wasn't assigned just for D.C." (ECF No. 107-1, at 16).

On November 29, 2016, A.T. and F.T. met with District staff to discuss concerns. (ECF Nos. 106, at ⁋ 164; 119, at ⁋ 164). During this meeting, District staff explained D.C.'s Crisis Plan to A.T. and F.T. and reviewed D.C.'s behavior logs. (ECF Nos. 106, at ⁋ 165; 119, at ⁋ 165).

On December 14, 2016, Ms. Nichols again coordinated a meeting with A.T., F.T., and other District staff members. (ECF Nos. 106, at ⁋ 180; 119, at ⁋ 180). District staff prepared an agenda in advance of the meeting, which included as agenda items: "Suspensions and documentation," "Weekly or Daily Report Sheets," and "Documentation of restraints? How many?/Was there any type of support in place after the restraints?" (ECF Nos. 106, at ⁋ 181; 119, at ⁋ 181; 107-4, at 14). It was ultimately determined at the December 14, 2016 meeting that D.C.'s Daily Behavior Charts would be completed and sent home on a daily basis, a parent meeting via telephone was scheduled for that Friday to review the Positive Behavior Chart and associated rewards with A.T., D.C., and the school team, and suspension letters would be emailed directly to A.T. (ECF Nos. 106, at ⁋ 182; 119, at ⁋ 182). Additionally, D.C.'s Evaluation Report states that "[a] meeting was held with the parent, educational advocate and

12

school team on 12/14/16 to discuss parent concerns.  During this meeting a 504 plan was discussed, however, at the time the family chose not to pursue implementation of a 504 plan." (ECF No. 107-15, at 2).  Ms. Nichols also states in her deposition testimony that "the parent may have stated she did not want a 504 Plan."  (ECF No. 107-1, at 153).

On December 15, 2016, D.C. threw objects at staff and students, screamed at staff members, and "smashed a computer mouse."  (ECF Nos. 106, at ⁋ 183; 119, at ⁋ 183).  Ms. Nichols was called by Principal McClinchie to help de-escalate D.C.  (ECF Nos. 106, at ⁋ 184; 119, at ⁋ 184).  Principal McClinchie escorted D.C. out of the room by "walking behind him and lifting him up under the arms."  (ECF Nos. 106, at ⁋ 185; 119, at ⁋ 185).  Whenever Principal McClinchie stopped escorting D.C., D.C. dropped to the ground and refused to move.  (ECF Nos. 106, at ⁋ 186; 119, at ⁋ 186).  Ms. Nichols called A.T., at which time she told A.T. that D.C. was not yet "at crisis level," but that if D.C. behavior escalated further, the District would contact Re:Solve Crisis Network.  (ECF Nos. 106, at ⁋ 187; 119, at ⁋ 187).  Ultimately, the District did not call Re:Solve Crisis Network, and D.C. was given a time out after the incident.  (ECF Nos. 106, at ⁋ 188; 119, at ⁋ 188).

On December 19, 2016, D.C. was standing by the cubby area.  (ECF Nos. 106, at ⁋ 193; 119, at ⁋ 193; 107-7, at 31).  When staff asked what was wrong, D.C. refused to answer.  (ECF Nos. 106, at ⁋ 193; 119, at ⁋ 193; 107-7, at 31).  Mr. Keilynn Burkes, a paraprofessional at the school, came over to check on D.C. and "he started to push into him with his body.  He then tried to kick Mr. Burkes.  He ran from him and started to throw our kids things around.  Mr. Burkes held onto him and he was screaming to get off.  We told him he was not allowed to touch the other children's things.  Mr. Burkes called the office for help."  (ECF No. 107-7, at 31).  District staff again contacted A.T. following this incident.  (ECF Nos. 106, at ⁋ 198; 119, at ⁋ 198).

On January 4, 2017, D.C. pushed three classmates and then refused to accept a time out. (ECF Nos. 106, at ⁋ 203; 119, at ⁋ 203).  On that same day, D.C. failed to remain in his seat on the bus, refused to obey the bus driver, hit other students, used profanity, stabbed a student with a pencil, and flipped over bus seats.  (ECF Nos. 106, at ⁋ 204; 119, at ⁋ 204).  In response to the incident at school, D.C. was given a time out and referred to Ms. Nichols, and A.T. was contacted again regarding the incident.  (ECF Nos. 106, at ⁋⁋ 206-7; 119, at ⁋⁋ 206-7).  In response, D.C. received a bus suspension from January 9 through January 13, 2017.  (ECF Nos. 106, at ⁋ 205; 119, at ⁋ 205).

### c.  January 5, 2017 Incident

On January 5, 2017, D.C. was throwing a football with some classmates.  (ECF Nos. 106, at ⁋ 208-9; 119, at ⁋ 208-9).  When he was told to stop, D.C. resisted and "grabbed and bear hugged" a teacher in an effort to take back the ball.   (ECF Nos. 106, at ⁋ 209; 119, at ⁋ 209; 107-5, at 5).  According to Ms. Nichols' School Counseling Case Note, D.C. went into one of the classrooms and "began to destroy the classroom by throwing objects such as books, pencils, papers, spaghetti noodles, folders and etc.  He also [was] playing with classroom equipment including teacher's computer, projector and Elmo.  [D.C.] began to stand on student's desks as well as jumping on them.  [D.C] was physically aggressive toward staff members by hitting, pushing, and directly throwing objects at staff.  [D.C] threw a book and a bag of noodles directly at School Counselor during the encounter."  (ECF No. 107-5, at 5).  Ms. Nichols' School Counseling Case Note indicates that D.C. "was able to de-escalate briefly while on the computer playing a shooting game."  (ECF No. 107-5, at 5).  At this time Ms. Nichols contacted A.T. and told her that D.C. was not following school rules or listening to his teachers.  (ECF Nos. 106, at ⁋

223; 119, at ⁋ 223; 107-5, at 5).  Ms. Nichols told A.T. that "the school would follow up regarding any updates."  (ECF Nos. 106, at ⁋ 223; 119, at ⁋ 223; 107-5, at 5).

Principal McClinchie came into the classroom "to support the crisis situation" and told D.C. "to get off of the computer."  (ECF No. 107-5, at 5).  In response, D.C. again climbed onto the student desks "and began trying to poke Mr. McClinchie with a pencil."  (ECF No. 107-5, at 5-6).  D.C. then fell in between the desks and "became upset and started punching Mr. McClinchie."  (ECF No. 107-5, at 6).  D.C. was told to stop hitting staff members, and Principal McClinchie took D.C. into the Main Office Conference Room to de-escalate.  (ECF Nos. 106, at ⁋ 211; 119, at ⁋ 211; 107-5, at 6).

Once he was in the Conference Room, D.C. "became physically aggressive toward" Principal McClinchie.  (ECF No. 107-5, at 6).  D.C. was "hitting, punching, spitting and throwing objects at Mr. McClinchie."  (ECF No. 107-5, at 6).  D.C. then "began to cry explaining that his foot was injured when the door hit it."  (ECF No. 107-5, at 6).  D.C. also took his shoes off in the Conference Room.  (ECF No. 107-5, at 6).

At this time, District staff contacted School Police "to help de-escalate [D.C.]."  (ECF No. 107-5, at 6).  According to Ms. Nichols' School Counseling Case Note, A.T. "was contacted again to inform about the events that have led up to this point and inform about School Police being contacted due do being unable to calm [D.C] down."  (ECF No. 107-5, at 6).  At this point Officer Marion Parker arrived at the school.  (ECF Nos. 106, at ⁋ 214; 119, at ⁋ 214).  Officer Parker stated in her deposition that when she first arrived in the Conference Room "he was talking loudly.  You could tell he was physically upset."  (ECF No. 107-13, at 58).  D.C. then tried to hide in the locker bay in the Conference Room.  (ECF No. 107-13, at 58).  Officer Parker stated that she first tried speaking with D.C. to try to get him to calm down.  (ECF No. 107-13, at

58-60).  Officer Parker convinced D.C. to get out of the locker and then he "runs over to the wall and now he's trying to hurt his self."  (ECF No. 107-13, at 59).  D.C. then started "slamming his head into the wall."  (ECF No. 107-13, at 60).  Officer Parker stated that she was trying to get D.C. to calm down, and she said, "if you don't stop I'll have to handcuff you.  I can't have you hurting yourself."  (ECF No. 107-13, at 60).  Officer Parker testified that she then handcuffed D.C. because she was concerned that he was going to hurt himself.  (ECF No. 107-13, at 61).  Officer Parker explained that as soon as she put the handcuffs on D.C., she noticed him start to calm down.  (ECF No. 107-13, at 61).  She stated that "as soon as I put them on him to restrain him from hurting his self, he didn't get mad, he didn't holler, he look at me and he took a breath."  (ECF No. 107-13, at 61).  Officer Parker then removed the handcuffs, and she testified that D.C. was handcuffed for less than 30 seconds.  (ECF No. 107-13, at 61).  Soon thereafter, A.T. arrived at the school and brought D.C. home.  (ECF No. 107-5, at 6).

The next day, on January 6, 2017, Ms. Nichols called A.T. at 10:12 AM and told her that D.C. was destroying a classroom and that Re:Solve Crisis Network was being contacted.  (ECF Nos. 106, at ⁋ 223; 119, at ⁋ 223).  Ms. Nichols called A.T. again at 1:01 PM, informing her that D.C. was "still in crisis" and that Re:Solve Crisis Network was there to support him.  (ECF Nos. 106, at ⁋ 224; 119, at ⁋ 224).

Over the weekend D.C. told his mother that a school police officer had handcuffed him the day before in the Main Office Conference Room.  (ECF Nos. 106, at ⁋ 225; 119, at ⁋ 225; 107-1, at 21, 69).  At this point, A.T. and F.T. decided to keep D.C. home from school until an appropriate plan could be implemented.  (ECF Nos. 106, at ⁋ 230; 119, at ⁋ 230).

### d. Evaluation Process and Special Education Supports

On January 9, 2017, A.T. and F.T. met with District staff.  (ECF Nos. 106, at ℙ 232; 119, at ℙ 232; 107-3, at 6).  As D.C. was not attending school at this time, the family asked about his homework packet along with computer access.  (ECF Nos. 106, at ℙ 231; 119, at ℙ 231; 107-3, at 6).  Additionally, A.T. and F.T. asked about implementing a Section 504 Plan, and District staff indicated that it could be set up at the next meeting, which was scheduled to take place on January 17, 2017.  (ECF Nos. 106, at ℙ 233; 119, at ℙ 233; 107-3, at 6).

D.C. received testing with Dr. Perdue on January 18, 2017.  (ECF Nos. 107-3, at 8; 107-15, at 2).  Additionally, A.T. completed the parent input form and parent rating scales, which she provided to the District on January 18, 2017.  (ECF Nos. 107-3, at 8; 107-15, at 14-19).

On January 26, 2017, the District completed its Evaluation Report, and ultimately determined that D.C. was eligible for special education supports as a student with an "Other Health Impairment" as a result of his ADHD and ODD diagnoses.  (ECF Nos. 106, at ℙ 234; 119, at ℙ 234; 107-15, at 21).  In reaching this conclusion, the Evaluation Report considered a Functional Behavior Assessment, behavior data collected throughout the course of the school year, and the Behavioral Assessment Systems for Children-Third Edition (BASC-3).  (ECF Nos. 106, at ℙℙ 235-37; 119, at ℙℙ 235-37; 107-15, at 7-19).  D.C. scored in the clinically significant and at-risk category in nearly every area of behavior assessed in the BASC-3.  (ECF Nos. 106, at ℙℙ 237; 119, at ℙℙ 237; 107-15, at 14-19).  The Evaluation Report also noted that D.C. had received 9 documented suspensions.  (ECF No. 107-15, at 2).

On February 14, 2017, and again on March 16, 2017, D.C.'s IEP team met.  (ECF Nos. 106, at ℙ 238; 119, at ℙ 238).  The IEP team ultimately determined that D.C. required a full-time emotional support setting.  (ECF Nos. 106, at ℙ 239; 119, at ℙ 239).  D.C. was placed at the

17

Watson Institute's Friendship Academy, an approved private school.  (ECF Nos. 106, at ⁋ 240; 119, at ⁋ 240).

## II.      Standard of Review

According to Federal Rule of Civil Procedure 56, a court must grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  For a dispute to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (internal quotations omitted).  Additionally, for a factual dispute to be material, it must have an effect on the outcome of the suit.  *Id.*  In reviewing and evaluating the evidence to rule upon a motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the" non-moving party.  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (internal quotations omitted).  However, where "the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,'" the moving party is entitled to judgment as a matter of law.  *Moody*, 870 F.3d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "Discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion.  Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Id.* at 256-57 (internal citation omitted).  "If the

18

evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).  Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of the party." *Id.* at 251 (internal citation omitted).

### III.   Discussion

#### a.   Count I – Violation of Section 504 of the Rehabilitation Act of 1973

D.C. argues that the District's "failure to provide [him] with appropriate behavior supports resulted in his inability to access Defendant's educational programming." (ECF No. 105, at 6).  The District argues that District was actively trying to support D.C. in his disability and that the undisputed facts show that it was willing to partner with A.T. to help D.C. find the support he needed.  (ECF No. 102, at 9).

Section 504 of the Rehabilitation Act of 1973 provides that: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  In order to prevail on his Section 504 claim against the District, D.C. must prove that: (1) he is disabled as defined by the Act; (2) that he is "otherwise qualified" to participate in school activities; (3) the District receives federal financial assistance; and (4) that he was excluded from participation in, denied the benefits of, or subject to discrimination at the school.  *Andrew M. v. Del. Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

The parties have agreed that the first three elements of the Section 504 cause of action are not at issue in this case.  (ECF No. 120, at 2).  Instead, the parties disagree on whether D.C. was

excluded from participation in, denied the benefits of, or subject to discrimination through the actions of the District.

The undisputed facts from both parties' Concise Statements of Material Facts demonstrate an extensive history and documentation of D.C.'s behavioral struggles at school. The undisputed facts show that the District had knowledge of D.C.'s struggles to remain calm and attentive in the classroom. Furthermore, the District was aware of D.C.'s ADHD and ODD diagnoses as of October 2016 and knew that he was taking medication to help control his impulsivity. In addition, there is ample record evidence that District staff members held repeated meetings amongst themselves and with D.C.'s family to try to coordinate a workable solution to manage D.C.'s behavioral difficulties.

As early as February 2016, during D.C.'s kindergarten year, the District sent documentation to A.T. regarding the SAP program, which would provide additional supports to D.C. in the classroom. A.T. testified that she never received this SAP documentation during D.C.'s kindergarten year, but that she did procure outpatient therapy for D.C. during the summer between his kindergarten and first-grade years. Additionally, a Safety Plan was also implemented in March 2016, during D.C.'s kindergarten year. Again, as early as September 2, 2016, the school guidance counselor, Ms. Nichols, called A.T. regarding "services and medication management." (ECF No. 107-3, at 3). On September 21, 2016, Ms. Nichols emailed A.T. the paperwork for the SAP program. On that same day, Ms. Nichols had a meeting with D.C.'s first-grade teachers to discuss D.C.'s behavior in school. Ms. Nichols provided sensory buckets to each of D.C.'s teachers and recommended the use of behavior charts during the school day. Following the September 21, 2016 meeting, the teachers planned to refer D.C. to MTSS or SAP if additional concerns persisted after this first round of interventions. On October 5, 2016,

D.C. was diagnosed with ADHD and ODD, which A.T. shared with the District.  On October 14, 2016, A.T. and Ms. Nichols had an unplanned meeting where A.T. came to the school to discuss concerns with how D.C. was being disciplined at school.  During this meeting A.T. signed the SAP paperwork.  On October 18, 2016, D.C. was prescribed Adderall to help control his behaviors, which A.T. again shared with the District.  On October 25, 2016, D.C. began working with the school psychologist in Social Skills Group.  On October 31, 2016, A.T. and F.T. met with District staff and requested that D.C. be evaluated to determine his eligibility for special education services and supports.  On November 1, 2016, the District also implemented a Crisis Plan for D.C., which provided recommendations for how to support D.C. whenever his behaviors became escalated.  On December 14, 2016, during a meeting between the District staff, A.T., and F.T., a Section 504 Plan was discussed, but the family ultimately decided not to pursue the implementation of the program at that time.  Finally, after the January 5, 2017 incident with Officer Parker, A.T. and F.T. met with District staff on January 9, 2017 and then requested the implementation of a Section 504 Plan.  Soon thereafter, the District conducted Section 504 testing and determined that D.C. was eligible for special education supports as a result of his disability as of January 26, 2017.  D.C. remained at Liberty Elementary until his transfer to Watson's Friendship Academy after March 2017.

A.T. reported that she had received "over a hundred phone calls" between October 2016 and January 2017 and that she received these calls "several times per week" from the District. (ECF No. 107-1, at 34).  Additionally, the District knew that D.C. was diagnosed with ADHD and ODD in October 2016.  (ECF No. 107-3, at 4).  The District did not create a Section 504 Plan for D.C. until January 26, 2017.  Record evidence demonstrates that the Section 504 Plan was initially discussed on December 14, 2016; however, A.T. choose not to pursue a Section 504

Plan at that time. The District argues that this was an evolving situation and they had taken many steps to make sure that D.C. was getting the care and attention that he needed. Although the District spent a significant amount of energy and attention trying to help D.C., none of the District's efforts seemed to improve D.C.'s behavior in school. The record demonstrates that D.C. was suspended for between seven and ten days during his first-grade year.[4]  Additionally, A.T. stated in her deposition testimony that she needed to pick D.C. up from school after nearly every incident at the school. As a result, D.C. was forced to miss many days and hours of classroom instruction. At this time, there remains a question of fact in this case of whether the school should have provided more behavioral supports to D.C. sooner to help accommodate his disabilities. As a result, both D.C.'s and the District's Motions for Summary Judgment will be denied with regard to D.C.'s Count I Section 504 claim.

Because D.C. seeks compensatory damages in addition to injunctive and declaratory relief, he must also prove that the disability discrimination that he claims to have experienced was intentional. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261-62 (3d Cir. 2013). In order to prove intentional discrimination, D.C. must prove that the District exhibited "deliberate indifference" towards his federally protected rights as a disabled inidvdual. *Id.* at 263. The Third Circuit applies a two-part test for finding deliberate indifference, which requires proof that the defendant: (1) had knowledge that the plaintiff's federally protected right was substantially likely to be violated; and (2) failed to act despite that knowledge. *Id.* at 265.

---

[4] D.C.'s Reply Brief indicates that D.C. was suspended for a total of seven days during his first-grade year. (ECF No. 122, at 7). The Court's reading of the District's Student Behavioral Data Log indicates that D.C. was suspended for a total of eight days during his first-grade year. (ECF Nos. 107-2, at 4, 5, 8). The Evaluation Report completed by the school psychologist indicates that D.C. was suspended for a total of nine days during his first-grade year. (ECF No. 107-15, at 2). A.T. stated in her deposition that D.C. was suspended for "over ten days in the school year." (ECF No. 107-1, at 35).

Deliberate indifference requires a "deliberate choice, rather than negligence or bureaucratic inaction." *Id.* at 263.

Under the first prong of the deliberate indifference test, D.C. must prove that the District had knowledge that his federally protected rights under Section 504 were substantially likely to be violated. As discussed above, the District had knowledge of D.C.'s diagnoses with ADHD and ODD. Furthermore, and even without knowledge of the diagnoses, the District was aware that D.C. was struggling behaviorally in school, as the District kept meticulous records of D.C.'s behaviors and the District's responsive interventions. As discussed above, there is a question of fact whether the District provided enough support to D.C. soon enough as a disabled individual. Likewise, a question of fact exists for whether the District had knowledge that D.C.'s federally protected rights under Section 504 were substantially likely to be violated.

Under the second prong of the deliberate indifference test, D.C. must prove that the District failed to act despite its knowledge that his federally protected rights under Section 504 were substantially likely to be violated. Again, and as discussed above, there is a question of fact of whether the District provided enough behavioral supports soon enough to help support D.C. in the classroom as a disabled individual. As such, the Court cannot determine that the District acted with or without deliberate indifference as a matter of law. In that a question must be submitted to the jury, both D.C.'s and the District's Motions for Summary Judgment will be denied as to D.C.'s Count I Section 504 claim with regard to the question of whether D.C. can satisfy the deliberate indifference standard.

### b. Count VII – Violation of PHRA for Disability Discrimination

D.C.'s state-based PHRA disability discrimination claim is analyzed under the same legal framework as his Section 504 claim. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

Likewise, the PHRA protects the same rights as Section 504 of the Rehabilitation Act of 1973.

*Id.*  Thus, D.C.'s PHRA claim for disability discrimination is analyzed through the same legal

framework as his Section 504 claim.  As such, and for the same reasons discussed above, a

question of fact exists as regards D.C.'s Count VII, PHRA claim for disability discrimination.

Thus, both D.C.'s and the District's Motions for Summary Judgment will be denied with regard

to D.C.'s Count VII, PHRA claim for disability discrimination.

### c.  Count VII – Violation of PHRA for Racial Discrimination

D.C.'s state-based PHRA racial discrimination claims are analyzed under the same legal

framework as Title VI of the Civil Rights Act of 1964.  *Kelly*, 94 F.3d at 105.  D.C. brings two

separate PHRA racial discrimination claims: his first claim is based on being disciplined unfairly

as a result of his race and his second claim is based on the incident where his grandfather saw

D.C.'s desk pushed against the wall and facing away from the teacher.

Title VI provides that no person shall "on the ground of race, color, or national origin, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity."  42 U.S.C. § 2000d.  Racial discrimination claims are analyzed under

the *McDonnell-Douglas* burden-shifting framework.  411 U.S. 792 (1973).  D.C., initially, must

establish a prima facie case of discrimination.  In the educational setting, a prima facie case of

discrimination is established where D.C. can prove that: (1) he is a member of a protected class;

(2) he suffered an adverse action at the hands of the District while pursuing his education; (3) he

was qualified to continue in the District's educational program; (4) he was treated differently

from similarly situated students who are not members of the protected class.  *Manning v. Temple

Univ.*, 2004 WL 3019230, *5 (E.D. Pa. Dec. 30, 2004) (citing *Bell v. Ohio State Univ.*, 351 F.3d

240, 252-53 (6th Cir. 2003)).  If D.C. can make a successful prima facie case for racial

discrimination under Title VI, the burden then shifts to the District to articulate a legitimate, nondiscriminatory reason for why D.C. received such treatment. *McDonnell*, 411 U.S. at 802. D.C. may then rebut the legitimate reason submitted by the District as mere pretext for intentional discrimination with sufficient evidence supporting that the District's purportedly legitimate reason is mere pretext. *Id.*

### a. Claim That D.C. Was Disciplined Unfairly and in a Racially Discriminatory Way

D.C. argues that he was disciplined by the District in a discriminatory fashion based on his race. (ECF No. 117, at 11). The District argues that any discipline that D.C. received in school was because of his behavior rather than his race. (ECF No. 102, at 10-11). Under the *McDonnell-Douglas* burden-shifting framework, D.C. must first satisfy his prima facie racial discrimination case. Under the first prong of D.C.'s prima facie case, it is undisputed by the parties that D.C. is an African-American student, which is a protected class under both Title VI and the PHRA.

Under the second prong of D.C.'s prima facie case, D.C. must show that he suffered an adverse action at the hands of the District while pursuing his education. D.C. cites his school disciplinary record at the school as evidence of the adverse action that he suffered while pursing his education. D.C. argues that the District's "records make clear that D.C. was in fact suspended, both in-school and out of school, for a total of seven days in first grade." (ECF No. 122, at 7). D.C. also points out that he was also given "eight days of lunch detention, nine days of bus suspensions, and seven time outs." (ECF No. 122, at 7). D.C. also argues that the school police were called on various occasions to discipline D.C. and that the school police handcuffed him on one of those occasions. (ECF No. 122, at 8). The District does not dispute these material facts, but instead argues that such were not adverse actions taken against D.C. but rather were

"in-the-moment" responses that were taken in response to the "aggressive and, at times, dangerous acting out behaviors of D.C." (ECF No. 102, at 10-11). The District does not contest that D.C. was disciplined during his first-grade year or that he received numerous suspensions, lunch detentions, bus suspensions, and time outs, or that the school police were called, or that restraints were used on D.C. The undisputed material facts thus suggest that D.C. did suffer adverse action at the hands of the District while pursuing his education. As such, D.C. is able to satisfy the second prong of his prima facie racial discrimination case.

It is also undisputed, under the third prong of D.C.'s prima facie case, that D.C. is otherwise qualified to continue in the District's educational program. Finally, under the fourth prong of D.C.'s prima facie case, D.C. must show that he was treated differently from similarly situated students who are not members of the protected class. D.C. has provided no evidence that he was disciplined unfairly on account of his race as compared to other similarly situated students who are not African American. The record does not support any inference that D.C. was frequently punished on account of his race. Instead, the record supports, and the parties do not dispute, that D.C. struggled to control his behavior in the classroom throughout the majority of his first-grade year. The District's records also demonstrate a careful documentation of D.C.'s behavioral concerns and the specific reasons for why he received certain punishments. As such, D.C. cannot satisfy the fourth prong of his prima facie case for racial discrimination.

Even if D.C. were able to somehow satisfy the fourth prong of his prima facie case, D.C.'s claim would still fail at the next step of the analysis under the *McDonnell-Douglas* burden-shifting framework. After a plaintiff has met his or her prima facie case of discrimination, the burden then shifts to the defendant to offer a legitimate, non-discriminatory reason for the purported adverse action. In this case, the District states in its Brief that D.C. was

26

disciplined in response to his behavioral concerns at school.  The District kept thorough notes of

any instances where D.C. refused to follow school rules and the consequences of such behavior.

As suggested by the District's record, the suspensions, time outs, police interventions, and the

use of handcuffs were all used in attempts to de-escalate D.C.  As maintaining order in the

classroom is paramount to maintaining a positive learning environment for the other students in

the classroom, the District is able to meet its burden of offering a legitimate, non-discriminatory

reason for the alleged discriminatory behavior.

As the District has met its burden under the second stage of the *McDonnell-Douglas*

framework, the burden then shifts back to D.C. to offer evidence that the District's non-

discriminatory reason for the alleged discriminatory behavior was offered as mere pretext.  D.C.

has offered no evidence to support that District's purported reason for the discipline was based

on racial animus rather than providing for classroom order.  There is no evidence in the record

that the District was disciplining D.C. on account of his race.  As such, D.C. is not able to meet

his burden of showing that the District's proffered non-discriminatory reason for why D.C. was

disciplined so frequently was offered as mere pretext.  As such, the District's Motion for

Summary Judgment with regard to D.C.'s Count VII, PHRA racial discrimination claim for

being disciplined too harshly on account of his race, will be granted, and D.C.'s Motion for

Summary Judgment as to said claim will be denied.  Judgment will be entered in favor of the

District as to D.C.'s Count VII PHRA racial discrimination claim for being disciplined too

harshly on account of his race.

### b.  Claim That D.C.'s Desk Was Positioned in a Discriminatory Way

As regards to D.C.'s claim that his desk was positioned in a discriminatory way, D.C.

argues that the District is unable to offer a legitimate reason for why D.C.'s desk was positioned

differently from a similarly situated Caucasian student.  (ECF No. 117, at 13). The District argues that the desks were positioned this way because the students were "acting out."  (ECF No. 102, at 12).  Under the *McDonnell-Douglas* burden-shifting framework, D.C. must first satisfy his prima facie racial discrimination case.  In this case, D.C.'s grandfather, F.T., observed that there were four students in Mr. Sible's first-grade classroom who had their desks pushed against the wall.  Three of the students were African American and one of the students was Caucasian. F.T. stated in his deposition that the three African-American students had their desks pushed up against the wall with their backs turned away from the teacher.  The Caucasian student, on the other hand, had her desk pushed against the wall, but her desk was facing the teacher.  Under the first prong of D.C.'s prima facie case, it is undisputed by the parties that D.C. is African American, which is a protected class under Title VI and the PHRA.

Next, D.C. is also able to satisfy the second prong of the prima facie case.  The undisputed facts show that D.C.'s desk was facing the wall, with his back turned from the teacher, along with two other African-American students.  D.C. and the two other students were unable to see the teacher without turning around in their chairs.  As such, this positioning of the desks in such fashion is an adverse action taken by the District against D.C.

It is also undisputed, under the third prong of D.C.'s prima facie case, that D.C. is otherwise qualified to continue in the District's educational program.  Finally, under the fourth prong of D.C.'s prima facie case, D.C. must prove that he was treated differently from other similarly situated students.  As was discussed under the second prong of D.C.'s prima facie case, D.C. and two other African-American students had their desks facing the wall.  The Caucasian student, however, had her desk pushed against the wall, but it was positioned so that her desk was facing the teacher.  As such, D.C. was being treated differently from a similarly situated

student who was not a member of the protected class.  Under this set of circumstances, D.C. is able to meet his prima facie case.

As D.C. has met his prima facie case, the burden now shifts to the District to articulate a legitimate nondiscriminatory reason for why D.C. had his desk facing the wall during instruction. The District explains that the students had their desks facing the wall because they had been misbehaving in classroom.  As discussed above, maintaining order in the classroom is paramount to maintaining a positive learning environment for the other students in the class.  As such, the District is able to meet its burden of offering a legitimate, non-discriminatory reason for the alleged discriminatory behavior.

As the District has met its burden of providing a legitimate, non-discriminatory reason for why D.C.'s desk was facing the wall, the burden now shifts back to D.C. to bring forth evidence that the District's non-discriminatory reason for the alleged discriminatory behavior was offered as mere pretext.  D.C. has offered no evidence to support that the District's proffered non-discriminatory reason of maintaining classroom order was based on racial animus rather than providing for classroom order.  There is no evidence in the record that D.C.'s desk was pushed against the wall on account of his race.  As has been discussed above, by the date of this incident, D.C. had an established history of behavioral difficulties at school.  As D.C.'s grandfather, F.T., stated in his deposition, the classroom was "complete chaos."  As the District has offered a legitimate non-discriminatory reason for why the students had their desks pushed against the wall, and as D.C. has not met his burden of showing pretext, judgment will be entered in favor of the District as to D.C.'s Count VII PHRA racial discrimination claim with regard to the positioning of the desks.  The District's Motion for Summary Judgment will be granted as to

D.C.'s Count VII, PHRA racial discrimination claims, and D.C.'s Motion for Summary Judgment as to said claims will be denied.

## IV.    Conclusion

Based on the foregoing, Plaintiff's Motion for Summary Judgment will be denied.

Defendant's Motion for Summary Judgment will be granted in part and denied in part. Defendant's Motion for Summary Judgment will be granted as to Plaintiff's Count VII, PHRA racial discrimination claims.  Judgment will be entered in favor of Defendant as to said Count VII, PHRA racial discrimination claims.  Defendant's Motion for Summary Judgment will be denied as to Plaintiff's Count I, Section 504 disability discrimination claim, and Count VII, PHRA disability discrimination claim.

As such, Plaintiff's Count I, Section 504 disability discrimination claim, and Count VII, PHRA disability discrimination claim, remain in the case.  Accordingly, an appropriate Order shall be entered.


DATE:  January 28, 2022

Marilyn J. Horan
United States District Judge